**CITIZENS FOR CLEAN AIR, INC., et al., Plaintiffs,**

**v.**

**CORPS OF ENGINEERS, UNITED STATES ARMY, et al., Defendants.**

**No. 72 Civ. 2259.**

United States District Court, S. D. New York.

Aug. 1, 1972.

Jeffrey C. Cohen, Martin H. Redish, New York City, for plaintiffs.

Williams & O'Neill, New York City, for defendants Consolidated Edison Co. of N. Y., Inc. and Charles F. Luce.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., New York City, for defendant Corps of Engineers, U. S. Army, and other Army defendants.

LASKER, District Judge.

The dynamics of a consumer system have prompted radical increases in the use of electric power in recent years. The public's demand for dependably available electricity continues to grow to a point where, in self defense, suppliers urge the consumer to "save a watt" so that the community will not be browned, blacked, or polluted out.

While efforts to educate the user proceed, construction of new facilities also goes forward. The public's need for new power sources inevitably conflicts with the public's equally stringent calls for clean air and water. This case involves precisely such competing public demands, which must be judged in accordance with the requirements of law protecting the environment.

We are called upon to review the sufficiency of administrative decisions in relation to the construction of a New York City power plant. The heart of the complaint is that the Army Corps of Engineers (Army Corps) has failed to comply with the provisions of § 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S. C. § 4332(2)(C) [§ 102], because it did not evaluate the environmental impact of its permit to the Consolidated Edison Company of New York (Con Ed) for construction in the East River at Asto-

ria, Queens, of a water intake and discharge facility for the cooling system of Con Ed's planned 800 megawatt fossil-fueled electrical generating plant known as Astoria No. 6. Plaintiffs seek a declaration that the permit is invalid and an injunction against all construction activity.

■ Two multi-faceted motions are before us. Both come on the heels of plaintiffs' filing their amended complaint June 8, 1972, and are posed before any defendant has answered.[1] Con Ed and its Chairman, Charles Luce, move to dismiss the complaint pursuant to Rule 12(b), F.R.Civ.P., "because the complaint fails to state a claim against the defendants." Although not noticed as part of their motion, the defendants also argue now that the court lacks jurisdiction over the subject matter of the suit and that the plaintiffs lack the requisite standing to sue. Plaintiffs move for summary judgment in their favor under Rule 56(a). Con Ed and Luce oppose this motion; the Army Corps opposes it, but goes further and asks for summary judgment for the defendants.

Prior to stating the several issues posed by these motions, it will be useful to review the facts of record.

### The Imbroglio Unraveled

In order to meet the growing needs for electrical energy in New York City and Westchester County, Con Ed has embarked on a varied program which includes new power plants and outside purchases. We are concerned here with its decision to add a new generating plant to its existing facilities in Astoria. Unit 6 has been planned for construction just north of Units 1 to 5. It was first proposed in 1969 along with a proposal for a Unit 7. The City of New York re-

jected the proposal for two new units, but approved Astoria 6 by Memorandum of Understanding dated August 22, 1970.

Construction on the generating plant has proceeded apace, Con Ed having obtained appropriate state and city permits as needed. On September 24, 1970, Con Ed applied for the permit under attack here. The permit was sought pursuant to § 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, to excavate, dredge, place fill, and to construct a screen well intake structure and a discharge channel in the East River. Excavation affects approximately 1.7 acres of river bottom and the placing of fill along adjoining shorelines. Dredging for the intake structure will entail removal of some 4,000 cubic yards of soil and 22,260 cubic yards of rock. For the discharge structure 7,000 cubic yards of soil and 3,200 of rock will be removed. 10,000 cubic yards of material will be used for land fill at the site, and some 26,000 cubic yards will have to be disposed of otherwise. As designed, most of both structures will be entirely under water.

The costs of the intake and discharge structures are not clearly set forth in the record. At the Army Corps hearings in March of 1972, Charles Luce stated that Con Ed had spent "about $30,000,000 on Astoria No. 6, and had "committed another $120,000,000." When asked about costs at oral argument on these motions, counsel for Con Ed represented that the structures will cost somewhat in excess of $1,500,000, while the entire Astoria No. 6 generating plant will cost $260,000,000, and that as of June 1st Con Ed has invested some $199,000,000 in Astoria No. 6.

On January 12, 1971, the Army Corps issued Public Notice No. 6696, announc-

---

1. Con Ed and Luce chose to make motions to dismiss under Rule 12 rather than answer. The Army Corps under Rule 12(a) has 60 days within which to answer or move, and since the amended complaint was filed June 8, 1972, that time period has not expired. A motion for summary judgment under Rule 56(a) can be made before answers have been filed while Rule 12(b) motions are pending. Stein v. Oshinksy, 348 F.2d 999, 1001 (2d Cir. 1965).

ing that Con Ed had applied for the construction permit, and stating: "The decision as to whether a permit will be issued will be based on an evaluation of the impact of the proposed work on the public interest. Factors affecting the public interest include, but are not limited to, navigation, fish and wildlife, water quality, economics, conservation, aesthetics, recreation, water supply, food damage prevention, ecosystems, and, in general, the needs and welfare of the people." [2]

On January 28, 1971, following the promulgation of Executive Order 11574 under which the Secretary of the Army is responsible for Refuse Act permits,[3] Con Ed was notified that a discharge application was required before any further action on the construction permit application would be taken. The discharge permit is required under 33 U.S. C. § 407, § 13 of the 1899 Act. The Army Corps decided to consider the construction application and the discharge application simultaneously. On February 16, 1971, the Army Corps wrote Con Ed in reference to its construction permit application, stating: "As the proposed work will have significant impact on the environment, you are requested to submit an Environmental Statement as required by Section 102 of Public Law 91–190, the National Environmental Policy Act of 1969." [4]

On July 28, 1971, Con Ed applied for the discharge permit. Its application was reviewed by the Army Corps and the federal Environmental Protection Administration and was returned to Con Ed for revision on October 12, 1971. On January 10, 1972, Con Ed resubmitted its discharge permit application, and on February 14, 1972 Con Ed submitted its assessment of the environmental impact of the construction and operation of Astoria No. 6. This document, 76 pages of text, 44 pages of appendices, and 44 of figures, is largely devoted to the whole of Astoria No. 6. The construction of the intake and discharge structures is evaluated in terms of its environmental impact.

Meanwhile, on February 3, 1972, Con Ed wrote to the Army Corps "to request permission to commence, on or before April 1, 1972, certain of the activities which are the subject of [construction permit] application and to initiate a request for emergency action relief pursuant to Section 10(d) of the Guidelines with Respect to Statements of Proposed Federal Actions Affecting the Environment, . . ." [5] The letter sought leave to begin the dredging, excavation and "associated in-river activities" and asked that the Army Corps call upon the Council on Environmental Quality to expedite the § 102 Statement review to permit the issuance of a permit on or before June 1, 1972. Con Ed offered to go ahead with the dredging and other activity at its own risk, and to agree that its interim work should not be considered as a factor in the Army Corps' decision on the construction or operation permit applications.

On February 23, 1972, the Army Corps issued a notice for a hearing on the construction permit application pursuant to its own regulations, 33 C.F.R. § 209.120(g). The hearing was held March 24 and 25, 1972. The Corps limited the hearing to the construction permit application, and not the discharge

---

2. Exhibit 2 to affidavit of Jeffrey C. Cohen sworn to June 8, 1972. This notice is required under the Army Corps' regulations, 33 C.F.R. § 209.120(f).

3. By Executive Order 11574 of December 23, 1970, the President structured "Administration of the Refuse Act Program" as a means of implementing Section 13 of the Act of 1899, c. 425, 30 Stat. 1152, 33 U.S.C. § 407, and subsequent related legislation.

4. Exhibit 5 to affidavit of Louis W. Pinata sworn to June 27, 1972.

5. "Guidelines" appear at 33 Federal Register, pp. 7724–29. Exhibit 14 to Pinata affidavit, supra.

application.[6] The notice of hearing invited participation and stated:

"Subsequent to, and based upon the information presented at the public hearing, a draft environmental impact statement, in accordance with Section 102(2)(C) of the National Environmental Policy Act of 1969, will be prepared and circulated for formal review and comment to Federal, State and local agencies. A copy of this draft environmental statement will also be made available to interested parties at the District Office for review and comment. Based upon the comments received a Final Impact Statement will be prepared." [7]

At the hearing the presiding officer, Colonel James W. Barnett, District Engineer for the New York District of the Army Corps, stated in his opening remarks:

"Because of the significant impact that the proposed work [intake and discharge structures] will have on the environment this office required the applicant to submit an environmental assessment for the pboject. The information contained in this assessment has been made available to the public and it will be used in this office in the preparation of an Environmental Statement. This Environmental Statement which we must prepare, will be prepared in accordance with Section 102 of Public Law 91–190 of the National Environmental Policy Act [sic] of 1969 and it will also contain any pertinent information presented at this hearing or as a result of this hearing." [8]

The hearing contains the statements of Con Ed's Chairman, numerous local government officials, Congressmen, local business and civic leaders, and citizens and residents of Astoria, Queens. The addition of the new power plant to the area had stirred up considerable public sentiment, pro and con. Colonel Barnett observed, after appropriate sections of the 1899 Act and § 102 of NEPA were read to the audience:

"In view of the widespread interest in this project and a possible misunderstanding of the ramifications and particulars, thereof, it is deemed desirable to both require the applicant to submit an Environmental Assessment in accordance with Section 102 that Environmental Policy Act [sic] and to hold a public hearing. In this way we hope that everyone could be informed of the proposal and be given an opportunity to express their views and comments."[9]

At the hearing the testimony was not limited to the construction permit application. Most of it (pro and con) evaluated the entire Astoria No. 6 and its environmental impact. Colonel Barnett clarified the relationship between Astoria No. 6 and the construction permit by stating that. "although this hearing and this application addresses the

6. The Corps limited the hearing on the construction permit because of the rule in Kalur v. Resor, 335 F.Supp. 1 (D.C. D.C.1971). There the court enjoined the Corps from granting any permit for discharges until the system was revised to accord with the National Environmental Policy Act (NEPA).

7. Exhibit 3 to Cohen affidavit, supra.

8. Transcript of Hearing, pp. 6–7 ; Exhibit 15A to Pinata affidavit, supra.

9. Councilman Manton at pp. 60–62 of the Transcript of the March Hearing reviewed the interlocking jurisdictional responsibility of federal agencies and urged that, regardless of later review by other agencies, the Army Corps "take official notice not only of the impact of this expansion on the navigable waters of the East River, not only of the effect upon the ecology of the East River, but also take cognizance of the overall damage to the environment more specifically the damage to the air quality of Astoria and in fact the entire city of New York which will be occasion[ed] if this expansion is permitted." See also note 10, infra.
Colonel Barnett's clarification was in response to Councilman Manton's comments. Manton and several speakers made it clear that they made statements premised on the understanding that a full NEPA § 102 review was about to be undertaken.

matter of the construction of certain items in the navigable waters of the United States, the national Environmental Policy Act requires me, as the Federal Official, proposing to take the major action having an effect on the environment to assess its total impact, not just its impact on the water, so we must do as [sic] exactly what you [prior speaker, Councilman Thomas J. Manton] said we must do and assess the entire impact, including that of air, noise and water.[10] Several other speakers stated explicitly that the hearing's scope under § 102 was the full environmental impact of Astoria No. 6, the occasion for this review being the construction permit.[11] One speaker specifically opposed the permit for its own sake,[12] but all the rest either supported or opposed the construction in the context of the entire power plant.

On March 29, 1972, Colonel Barnett prepared a memorandum to the Division Engineer, North Atlantic, on the subject of "Advance Approval of Construction by Consolidated Edison Company of New York, Inc., in East River at Astoria, N. Y." [13] The memorandum was in response to Con Ed's February 3, 1971 letter requesting permission to begin construction before the issuance of a permit and help in accelerating the § 102 statement.

In Barnett's memorandum he states that, although the original intention had been to treat the construction and discharge permit applications together, since the hearing produced no objections to the construction work in itself (memorandum, para. 4), since four to six months were needed on the evaluation of environmental impact before a draft could be readied (Id., para. 5), since Con Ed was ready to do the work at its own risk and had to commence it if Astoria No. 6 was to be operational by the summer of 1974 (Id., para. 6), since New York State had given its approval where required (Id., para. 7), since the federal Environmental Protection Administration "offered no objection to the proposed construction work specifically," although questioning "the effects of the proposed plant expansion on both air and water pollution" (Id., para. 8), and since the United States Department of the Interior had determined on May 14, 1971, that discharges from the plant would not block migration routes of anadromous fish (Id., para. 9),

"10. It is recommended that Consolidated Edison Company of New York,

---

10. Congressman Herman Badillo addressed himself to the issue of "whether construction of this particular plant is the best possible means of providing additional power reserves" (p. 13 of Exhibit 15B to Pinata affidavit, supra), and stated that this question "goes right to the heart of the key issues which the Corps of Engineers must weigh under provisions of the National Environmental Policy Act." (Id., at 16). He then reviewed the dangers of air pollution and the available alternative energy sources.

Counsel for plaintiff Citizens For Clean Air, Inc., Sigmund Anderman, Esq., stated: "The duties of the Corps here, we believe, arise out of the national environmental policy act of 1969 and specifically Section 102(C) of that act. That act requires that the Corps prepare an environmental impact statement setting forth the effect on the environment of the proposed expansion of this facility. The Corps has recognized this obligation

in the notice which scheduled this very hearing . . . " (pp. 33–34 of Exhibit 15B to Pinata affidavit, supra). He then reviewed the NEPA requirements and introduced the executive director of Citizens For Clean Air, whose statement purported to examine the full scope of the impact of Astoria No. 6.

A prior statement by a representative of the New York Scientists Committee For Public Information, also made on behalf of Citizens For Clear Air, indicated that he believed the construction itself was of no substantial impact, but that the entire Astoria No. 6 project had major impact. (Exhibit 15A to Pinata affidavit, supra, pp. 105 et seq.).

11. Transcript of March 25th Hearing, pp. 16 and 33; Exhibit 15A to Pinata affidavit supra.

12. E. g., Exhibit 15A to Pinata affidavit, at p. 122.

13. Exhibit 4 to Pinata affidavit.

Inc., be advised that the Department of the Army will not interpose any objection to the commencement of work on the intake and discharge facilities prior to formal decision on the application on the understanding that such work is undertaken at the sole risk of the company and on the further understanding that such construction at the company's own risk will not be a factor which will be considered in evaluating the pending application. It is further recommended that the company be also advised that under the circumstances, the Department would not ask the Department of Justice to initiate any action against the company because of any construction it may undertake at this locality in accordance with the plans filed with the District Engineer covering such work."

This memorandum proceeded through the appropriate ranks of the Army Corps. On April 13, 1972, Major General J. W. Morris, Director of Civil Works in the Corps, sent a memorandum to the Under Secretary of the Army.[14] In it he rejects the proposal that Con Ed be allowed to proceed without a permit on the assurance that it would not be prosecuted. (Morris memorandum, para. 2). He sets forth three grounds for the conclusion that the application for *discharge* permit—rather than the *construction* permit—"would be the major Federal action significantly affecting the human environment" (Id., para. 3). The reasons were that

"a. The proposed construction has received the State water quality certification and the State construction permit.

"b. The Department of the Interior will offer no objection to the construction and operation of the proposed structures.

"c. EPA offered no objection to the proposed construction and separation of the Section 10 [construction] permit, while raising questions on air, water and noise pollution that could result from the operation of the plant."

By direction of the Under Secretary of the Army, Charles R. Ford, Chief of the Office of Civil Functions, in a memorandum of April 13, 1972, ruled against the recommendation that Con Ed be permitted to go ahead with assurances that no prosecution would result. He further ruled:

"The Section 10 [construction] permit may be issued subject to the conditions proposed in para. 3c of your indorsement dated 13 April 1972, with the additional condition that the company remove any structures or facilities constructed in navigable waters as a result of the Section 10 permit in the event the Government decides against issuances of the Section 13 discharge permit under consideration at this time." [15]

On April 20, 1972, the Army Corps issued the construction permit No. 8463 subject to the conditions cited above and others.[16] The permit's terminal date is December 31, 1975. In the meantime, the Army Corps has continued to work on an impact statement under § 102 of NEPA which will review "all aspects of the operation of Astoria No. 6." (Army Corps Statement pursuant to General Rule 9(g) of this Court). There is no indication in the record whether construction under the permit has or has not begun.

### The Issues

Out of this factual chronicle and the two motions pressed here four issues emerge:

(1) Does the Court have subject matter jurisdiction?

(2) Have the plaintiffs established standing to sue?

(3) Does the complaint state a cause of action against Con Ed and Luce?

14. Exhibit 20 to Pinata affidavit.

15. Exhibit 21 to Pinata affidavit.

16. Exhibit 22 to Pinata affidavit.

(4) In issuing the construction permit, has the Army Corps violated § 102 of NEPA? Ancillary to determination of this issue, did the Army Corps, having once decided the construction was a major federal action significantly affecting the quality of the human environment, act either in an arbitrary and capricious manner in reversing itself or in a manner violative of the standards imposed by NEPA?

### 1. Jurisdiction

Plaintiffs' amended complaint alleges jurisdiction over the subject matter under several statutes: 5 U.S.C. § 702 (Administrative Procedure Act); 28 U.S.C. § 1331(a) (federal question); 28 U.S.C. § 1337 (actions arising under laws regulating commerce); 28 U.S.C. § 1361 (actions in the nature of mandamus); 28 U.S.C. § 2201 (declaratory judgments); 28 U.S.C. § 2202 (further relief on a declaratory judgment).

Con Ed and Luce argue that the Court lacks subject matter jurisdiction. Although attacking plaintiffs' several bases for jurisdiction, the defendants curiously do not attack plaintiffs' reliance on 5 U.S.C. § 702, the Administrative Procedure Act (A.P.A.). They limit their contentions to asserting that the matter in controversy here cannot exceed $10,000 as required under 28 U.S.C. § 1331(a), that 28 U.S.C. § 1337 is irrelevant since the suit involves no laws regulating commerce, and that 28 U.S.C. § 1361 is inapplicable since there is "no duty owed to the plaintiff" present in this complaint. Assuming the lack of jurisdiction, they assert that no declaratory or other relief may be awarded under 28 U.S.C. §§ 2201 and 2202.

■ Defendants' motion to dismiss for lack of jurisdiction is denied. The motion evaporates of itself because no challenge is made to the clearly viable jurisdiction authorized by § 10 of the Administrative Procedure Act. It is settled that judicial review under the A.P.A. is foreclosed "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent . . ." Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), citing Rusk v. Cort, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962). Review of the legislative history of NEPA reveals no such "contrary intent." Indeed, the Act's structure and its interpretation by administrative agencies and courts firmly establish that judicial review is crucial to NEPA's implementation.[17]

We hold, as did Judge Murphy of this Court in an analogous case arising from environmental issues, that "[s]ince the presumption in favor of jurisdiction has not been rebutted by a clear and convincing presentation of an opposite legislative intent . . . this court has the necessary jurisdiction to rule on the dispute under the Administrative Procedure Act." Citizens Committee for the Hudson Valley v. Volpe, 302 F.Supp. 1083, 1091 (S.D.N.Y.1969), aff'd 425 F. 2d 97 (2nd Cir.), cert. den. 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256.

■ Since jurisdiction clearly exists under the A.P.A., we do not dwell at length on the challenges to plaintiffs' alternative bases. Suffice it to say that where jurisdictional amount is involved in environmental litigation, the measure of "a matter in controversy" in excess of $10,000 cannot easily be resolved on a

---

17. In recent testimony by the Chairman of the Council on Environmental Quality, the agency created by NEPA and charged by NEPA to oversee its implementation, Russell Train stated: "NEPA carries with it court enforceability of its requirements. This means that it cannot be ignored and that top agency management must take a fresh look at on going policies and programs in terms of their environ-mental impacts." (Testimony Before the Joint Hearing of the Senate Committees of Public Works and Interior and Insular Affairs on the NEPA, March 1, 1972). Indeed, one court appears to have held that jurisdiction was conferred upon it by NEPA alone. See Environmental Defense Fund v. Hardin, 325 F.Supp. 1401, 1407 (D.C.D.C.1971).

motion to dismiss. The physical value of Astoria No. 6 and its intake-discharge structures, of course, involves many times this amount. No showing of the quantified costs from new pollution has been made to question plaintiffs' allegation that they will exceed $10,000. It is established that "[t]he rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). It does not appear to the "legal certainty" required by *St. Paul Mercury* that plaintiffs do not meet the jurisdictional amount required under 28 U.S.C. § 1331(a).

■ Moreover, since this action challenges a permit issued under 33 U.S.C. § 403, which is an act grounded on the commerce clause and one to which NEPA adds administrative requirements, we also find that jurisdiction is well founded on 28 U.S.C. § 1337. Zabel v. Tabb, 430 F.2d 199, 203–204 (5th Cir. 1970), cert. den. 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). Under the circumstances, it is not necessary for us to determine whether, as plaintiffs contend, Congress' power to enact NEPA is grounded on the commerce clause or the necessary and proper clause or in part on the authority over navigable waters and other constitutional provisions.

Finally, having established jurisdiction on several different bases, each of which appears sufficient to support a grant of the relief sought here, we need not resolve the issue of whether 28 U.S.C. § 1361 applies.

Jurisdiction, accordingly, is established here under 5 U.S.C. § 702, 28 U.S.C. § 1331(a) and 28 U.S.C. § 1337. This being the case, the court may grant appropriate relief under 28 U.S.C. §§ 2201 and 2202. Cf. A. Seltzer & Co. v. Livingston, 253 F.Supp. 509 (S.D.N.Y. 1966), aff'd 361 F.2d 218 (2d Cir. 1966); although those sections do not, of course, confer jurisdiction independently.

### 2. Standing to Sue

Con Ed and Luce contend that plaintiffs do not allege that they suffer or will suffer any injury as a result of the construction, that the allegations of dangers to water and air quality from Astoria No. 6 are not germane here or, if they are relevant, they are "wholly inadequate to establish that plaintiffs have standing to sue." Plaintiffs reply that their complaint alleges facts sufficient to show that they are "adversely affected"; that is, that plaintiffs and their members reside in the area, breathe the air which they claim will be polluted, use the river for fishing and recreation, and are aggrieved because "they have been denied an environmental protection afforded to them under the National Environmental Policy Act of 1969."

The Supreme Court's recent decision in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), is dispositive of the question. There, as here, the matter of standing as defined by § 10 of the A.P.A., 5 U.S.C. § 702, was at issue. The Court elaborated on its rulings in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L. Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), and applied them to a plaintiff suing as to environmental protection issues. The Court ruled that, while aesthetic and environmental well-being, like economic well-being, are sufficient interests to warrant protection from legal wrong or injury, nonetheless

" . . . the 'injury in fact' test [established by earlier decisions] requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured."

The Court further observed:

" . . . a mere 'interest in a problem,' no matter how longstanding the

interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA."

In holding that the Sierra Club lacked standing to challenge approval of a road and power line through a national park, the Court noted that nowhere in the pleadings did the plaintiff state that its members used the forest for any purpose, "much less that they would be significantly affected by the proposed actions of the respondents."

█ The instant complaint alleges that (1) all members of the two plaintiff organizations and the one individual plaintiff reside in and around "New York metropolitan areas"; (2) the Hudson River Sloop Restoration[Sloop]'s "principal purposes have been to investigate the conditions of [the region's] waterways and to take steps to improve their water quality through, among other avenues, education of the public. Members of [Sloop] fish the East River and use it for other recreational purposes"; and (3) the construction of Astoria No. 6 presents "serious dangers to the quality of air in the New York metropolitan area, and to the water in the East River."

While these allegations as to standing are just about as bare-boned as possible, they do marginally skirt the brink of dismissal. Guided by the mandate of Rule 8(f) to construe the pleadings to do substantial justice, we find that standing is sufficiently alleged, as discussed below.

Even if we were to dismiss the complaint, we would, however, in the interest of justice, do so without prejudice to plaintiffs' making a motion to amend under Rule 15. Rather than engage in this technical pirouette, we believe the sounder course is to deny the motion to dismiss for lack of standing on the condition that plaintiffs amend the complaint within 20 days to make the plead-

ings of standing explicit rather than implicit. As was said in United States v. Hougham, 364 U.S. 310, 317, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960), there quoting Conley v. Gibson, 355 U.S. 41, 48, 78 S. Ct. 99, 2 L.Ed.2d 80, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." See also 3 Moore's Fed.Prac. para. 15.09, and cases there cited.

Our reasons for finding that the complaint ought not to be dismissed follow:

█ Initially, we put aside plaintiffs' allegations of "mere interest." Plaintiffs Abrams and Citizens for Clean Air cannot found standing only on their "concern for the deteriorating ambient air quality of this area," nor can Sloop ground its injury in fact only upon its "concern about the deteriorating waters." Taken alone, these statements fail the test announced by *Association Data Processing Barlow* and, most recently, *Sierra Club.*

The injury sufficient to confer standing alleged by Citizens for Clean Air and Abrams is the harm to the region's air forecast by plaintiffs should Astoria No. 6 become operational. Implicit in the complaint's allegations of residence and danger are the facts which we can judicially note that the individual plaintiffs and the members of the organizational plaintiffs breathe the region's air and the fossil fuel power plants contribute to air pollution levels in the New York metropolitan area. These allegations can mean nothing other than that completion of Astoria No. 6 would threaten plaintiffs' health by increasing air pollution.

Sloop's injury is more fully alleged. Its members use the East River for recreation and fishing, and it is organized for the restoration of the waters and waterfront. From these premises the conclusion is properly inferable that

should the water quality deteriorate, Sloop's members' uses and its organizational aims would be injured.

What is implicit in the complaint should be made explicit. The *Sierra Club* ruling imposes no new or unusual pleading burdens, and there is no excuse or need for plaintiffs' shorthand allegations of injury. To be sure, the complaint here is more fully concerned with the compliance by the Army Corps with NEPA than it is with the ultimate damage to plaintiffs' interests in the air and water. However, it is only by establishing the adversarial context that plaintiffs may proceed to assert the broader claims for which a "logical nexus" exists. Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

Accordingly, we deny the motion to dismiss for lack of standing on the condition indicated.

### 3. The Rule 12(b)(6) Motions by Con Ed and Luce

Con Ed and Luce move to dismiss the complaint for failure to state a claim against each of them. While their motions are directed against the entire complaint, only the second cause of action is directed against them. It alleges that, since the construction permit is void, Con Ed should be enjoined from undertaking any construction purported to have been authorized by the statute. Luce is mentioned only as Chairman of Con Ed, and no specific relief is requested as to him. Luce argues that "he is neither a necessary, indispensable, formal nor proper party" under the Rules. Con Ed contends that, since the Army Corps issued the permit properly, Con Ed's construction under it is lawful and no claim against Con Ed is framed. This argument is the same one that Con Ed makes in its opposition to the motion for summary judgment.

■ We find Luce's motion sound. The complaint asserts no claim against him personally. While he is the chief executive officer of Con Ed, his presence is not essential or necessary for the relief sought by plaintiffs. In the event plain-

tiffs ultimately prevail, any order against Con Ed would include its agents and would assure effective relief to the plaintiffs. Accordingly, the complaint as against Luce is dismissed under Rule 12(b)(6).

■ Con Ed's motion, on the other hand, has no merit. To argue that no claim is stated because the permit is valid begs the very question of the lawsuit. If the permit be void, the claims against Con Ed are very real and Con Ed is a necessary party to assure plaintiffs' full relief. That the permit's validity turns on the cause of action against the Army Corps does not alter the fact that good claims are pressed against the utility. Con Ed's Rule 12(b)(6) motion is denied.

### 4. Motion for summary judgment—Construction Permit and Violations of NEPA

Having passed the hurdles of the procedural "preliminaries," the motion for summary judgment resolves itself with less ado. This is peculiarly the case here, since as to the genuine issues of material fact there is agreement and, most importantly, the Army Corps agrees that ultimate federal approval of Astoria No. 6 through the issuance of permits is "a major federal action significantly affecting the quality of the human environment."

Plaintiffs' motion for summary judgment under Rule 56(a) seeks judgment for all claims in the amended complaint. These may be summarized as follows: (a) the claim that the Army Corps violated § 102 of NEPA; (b) the claim that the Corps violated its own regulations in awarding the permit, 33 C.F.R. § 209.120(d)(1); and (c) the claim that Con Ed should be enjoined "from undertaking any and all construction activities" authorized by the permit since that permit is void.

We turn first to plaintiffs' NEPA claim.

It is clear that the Army Corps "has the authority to make its own threshold determination as to [whether an action is either major or of significant effect]

in deciding whether an impact statement is necessary." Hanly v. Mitchell, 460 F.2d 640 (2d Cir. 1972). The Corps has the duty of making clear its threshold decision, the rationale for the decision, and the means of arriving at that determination; and "in the context of an act designed to require federal agencies to affirmatively develop a reviewable environmental record, . . . perfunctory and conclusory language simply does not suffice . . . " Hanly, supra. The "Guidelines" of the Council on Environmental Quality make it clear that "[a]s early as possible and in all cases prior to agency decision concerning major action" the assessment must take place. 36 Federal Register, pp. 7724–27, para. 2 (No. 79, April 23, 1971).

Here the Corps' first threshold decision was to combine the construction and operation permit applications and make a single review. Such a consolidated review would certainly have facilitated the "systematic, interdisciplinary approach" imposed on all agencies under § 102(2)(A). The Corps' public hearing for the construction application covered all aspects of Astoria No. 6's environmental impact. While work continued on the Statement, preparation did not proceed quickly enough for Con Ed to meet its construction schedule. At this point push came to shove.

 Despite its prior decisions that a § 102 Statement was required, the Corps tried to accommodate the Con Ed schedule. Without making its own analysis of the impact of the construction, it merely cited the fact that state permits were given and the Department of the Interior did not object, and the EPA "offered no objection . . . while raising questions on air, water and noise pollution that could result from the operation of the plant." [18] Under Hanly, supra, and under Greene County Planning Board v. Federal Power Commission, 455 F.2d 412 (2d Cir. 1972), this perfunctory listing of other agencies' conclusions is an inadequate record to support the Corps' threshold determination, and legally constitutes arbitrary and capricious action, however earnestly the course was chosen.

Indeed, the Army Corps ran afoul the mandated requirements of NEPA in a more profound way. Having determined that Astoria No. 6 required a § 102 Statement before federal action could be taken, the Corps sought to accommodate Con Ed with a ruling of convenience that construction could continue with a federal permit until the imminent § 102 review was completed.

The decision to issue the permit without an environmental impact review runs counter to the fundamental requirements of NEPA. The central purpose of the Act is defeated if agencies carve "federal actions" into exempted fragments. § 102 "is a mandate to consider environmental values 'at every distinctive and comprehensive stage of the [agency's] process.'" Greene County, supra, at 420. Moreover, "the Section 102 duties are not inherently flexible. They must be complied with to the fullest extent . . . Considerations of administrative difficulty, delay or economic costs will not suffice to strip the section of its fundamental importance." Calvert Cliffs' Coord. Committee v. United States Atomic Energy Comm., 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).

18. (Quote from Exhibit 20 to Pinata affidavit, supra.)
The fact that no one explicitly attacked the construction of the intake and discharge structures *alone* cannot serve as a basis *alone* for the Army Corps' finding that there would be no significant impact on the environment. It may be a factor to be considered. One speaker did oppose *any* further development and degradation of the river front, and thus implicitly attacked the construction here. The hearing's scope covered all of Astoria No. 6, and the Corps did not press to limit it to the construction of the structures. Negative evidence of environmental impact, especially as diffuse as at a public hearing of this sort, cannot be substituted for the Corps' affirmative determination, independently made, that the impact is insignificant.

Where several federal permits or approvals are required for a project, NEPA requires a § 102 review at the point where the action is "distinctive and comprehensive." Once a project has reached a coherent stage of development it requires an environmental impact study. The comprehensive review contemplated by the Act can only be efficacious if undertaken as early as possible. Conceivably there may be circumstances where the first of several federal actions on the same project might not warrant a full § 102 review. If the federal involvement or approval is slight and the impact on the environment is *de minimis,* a proper threshold determination to put the environmental impact study off for a more distinctive point may be called for. Such is not the case here.

In the instant case, the project has advanced to the point where a careful and independent federal review of alternatives to the intake-discharge water cooling system is indisputably called for. Several of the ends which § 102 is designed to assure are defeated by the absence of a review at this point:

(i) Permitting construction of the intake-discharge facilities here would eliminate any analysis of the impact which the building or, if necessary, the tearing down of the structures might have (§ 102(2)(C)(i)).

(ii) While Con Ed has studied alternatives to these structures and the kind of cooling system they provide (vid. Environmental Report on Astoria No. 6, January 1972, Exhibit 11 to Pinata affidavit, supra), there has been no independent *federal* review of alternatives as required. (§ 102(2)(C)(iii)); *Greene County,* supra, 455 F.2d at 420. Here, because the cooling system is integral to the power plant, alternatives are especially important. As was said in Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972), "[w]hen the proposed action is an integral part of a coordinated plan to deal with a broad problem, the range of alternatives that must be evaluated is broadened."

(iii) Finally, it is at least arguable that the costs of building these structures, and the possible dismantling expenses, are "irreversible and irretrievable commitments of resources" which require analysis (§ 102(2)(C)(v)). Indeed, the Army Corps' condition in the permit issued, "that the construction undertaken will not be a factor which will be considered [by the Corps] in evaluating [Con Ed's discharge permit application]," might, ironically, defeat the purpose of analyzing "irretrievable commitments of resources."

The proposition that review of an entire project ought not be undertaken because a part of the project is up for federal action has been rejected in analogous circumstances. The construction of segments of highway has been held to trigger § 102 requirements. See San Antonio Conservation Society v. Texas Highway Dept., 2 E.R.C. 1871 (5th Cir. Aug. 5, 1971); Scherr v. Volpe, 336 F. Supp. 882 (W.D.Wis.1971).

Accordingly, we find that the Army Corps has not complied with NEPA in issuing Permit No. 8463. Our sympathy for the Corps in making a difficult choice between what it doubtless saw as competing public demands does not permit us to excuse compliance with NEPA. We are told by counsel for the Corps on these motions that a draft § 102 Statement should be prepared in two weeks, and thus little actual delay perhaps need be occasioned by the rulings here. The full pre-operating review under NEPA may not be circumvented even in the face of "the 'national power crisis,'" *Calvert Cliffs',* supra, 449 F.2d at 1127–1128. As was noted pointedly in *Greene County,* supra, 455 F.2d at 422–423, "the spectre of a power crisis 'must not be used to create a blackout of environmental consideration in the agency review process.'"

Plaintiffs are entitled to summary judgment against the Army Corps for its failure to comply with NEPA. The facts of record are insufficient to determine the allegation that the Corps' action also violates its own regulations, 33

C.F.R. 209.120(d)(1), and accordingly no finding is made as to this claim. Nor are plaintiffs entitled to relief at this time against Con Ed. Complete as the factual discussion above has been, it relates solely to the issuance of the permit by the Corps of Engineers, and plaintiffs simply have furnished no facts as to Con Ed's actions in relation to construction of the intake-discharge structures. Even though the permit issued is void for noncompliance with NEPA, unless plaintiffs meet their burden of showing that Con Ed is undertaking construction or intends to do so despite the absence of a valid permit, no summary judgment can be granted on the second cause of action.

In view of the public importance of the subject of the case, any injunction to be granted should be carefully and responsibly fashioned. Accordingly, the court will meet with counsel to discuss appropriate terms of injunctive relief in the circumstances.

The foregoing constitutes the court's findings of fact and conclusions of law as required under Rule 52(a) of the Federal Rules of Civil Procedure.

It is so ordered.