George **BIDERMAN** et al., Plaintiffs-Appellants,

v.

Rogers C. B. **MORTON**, Secretary of Interior, et al., Defendants-Appellees.

No. 976, Docket 73–2842.

United States Court of Appeals, Second Circuit.

Argued May 15, 1974.

Decided May 30, 1974.

Donald J. Cohn, New York City (Angus MacBeth, New York City, Thomas H. Jackson, of counsel), for plaintiffs-appellants.

Harold J. Friedman, Asst. U. S. Atty. E. D. N. Y. (Edward John Boyd V, Acting U. S. Atty. E. D. N. Y., on the brief; Raymond J. Dearie, Asst. U. S. Atty. E. D. N. Y., of counsel), for Federal defendants-appellees.

Edward S. Raskin, Asst. Islip Town Atty., Islip, N. Y. (Francis G. Caldevia, Islip Town Atty., Islip, N. Y., on the brief), for Islip defendants-appellees.

C. Francis Giaccone, Lake Ronkonkoma, N. Y., on the brief, for Brookhaven defendants-appellees.

J. Stewart McLaughlin, Bay Shore, N. Y., for Ocean Beach defendants-appellees.

Before KAUFMAN, Chief Judge, and HAYS and OAKES, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Efforts by environmentalists to preserve our natural habitat—in this instance, Fire Island—cannot help but strike a sympathetic chord. Indeed, this is particularly true where, as here, this laudable purpose appears frustrated by a federal statutory scheme which, despite its lofty terms, provides a mere chimera of environmental protection. Although appellants [1] evoke our empathy and full understanding of their justifiable frustrations, we can find nothing in the law to justify reversal of the district court's denial of the preliminary injunctive relief they sought principally to restrain the municipalities located on Fire Island [2] from issuing various construction permits and granting zoning variances pending preparation of an environmental impact statement [EIS] by the federal appellees.[3] We, like the court below, cannot bend well-settled principles of federal jurisdiction even to staunch what the appellants allege to be

---

1. Plaintiffs-appellants, fourteen Fire Island property owners, are suing individually and as representatives of a number of property owners associations.

2. The municipal defendants-appellees are the governing officials of the Towns of Islip and Brookhaven, and the Villages of Ocean Beach and Saltaire.

3. The federal defendants-appellees are the Secretary of the Interior and various officials of the National Park Service. To the extent that appellants sought preliminary injunctive relief against these defendants, we find no grounds for such relief.

overdevelopment of Fire Island. Accordingly, we affirm.

### I.

Fire Island, as described by Judge Dooling below,[4]

is 32 miles long, a slender barrier sand-bar between the Atlantic Ocean and the South Shore of Long Island, dividing the Great South Bay and the westerly end of Moriches Bay from the Atlantic Ocean and extending from a point roughly opposite Babylon to a point roughly opposite East Moriches. It varies in width from as little as 550 feet to not more than about 1,760 feet. At its westerly extremity, and covering some five miles, is the Robert Moses State Park, and at that point, Fire Island is connected across Great South Bay and intervening islands to the West Islip-Brightwaters area by the Robert Moses Causeway. . . . About six miles or so from the east end of Fire Island a second connection to Long Island in the Mastic Beach area is furnished by a bridge from Smith Point County Park on Fire Island to William Floyd Parkway. . . .

The beauty of the island, the western portion of which lies within a mere 50 miles of New York City, is well captured in a report prepared by the Department of the Interior in 1963 for the Senate Committee on Interior and Insular Affairs. That report, in the form of a letter addressed to the Committee Chairman, Senator Jackson, states, in pertinent part:

Fire Island contains an impressive array of seashore resources. The beaches are wide, clean, and gently sloping. The dunes are imposing and usually well stabilized by beach grass, bayber-

ry, other vegetation, and some low-lying pitch pine. The sunken forest, in the western half of the island, is a gem of its kind, dominated by American holly trees—some several hundred years old—with an accompaniment of sassafras, red-cedar, and pitch pine. 1964 U.S.Code Cong. & Adm.News, p. 3714.

That Fire Island would be attractive to the vast urban population residing in such close proximity is hardly surprising. Indeed, we are told, for example, that the Village of Ocean Beach, which covers approximately 1800 feet of sand from bay to ocean, experiences a virtual population explosion in the summer months, with its winter population of 100 increasing hundredfold to in excess of 10,000.

With the potential for despoliation no doubt in mind, Congress, on September 11, 1964, passed the Fire Island National Seashore Act, 16 U.S.C. § 459e et seq., thereby establishing the "Fire Island National Seashore" [Seashore]. The purpose of the statute, in the words of the Act, is:

[To conserve and preserve] for the use of future generations certain relatively unspoiled and undeveloped beaches, dunes, and other natural features within Suffolk County, New York, which possess high values to the Nation as examples of unspoiled areas of great natural beauty in close proximity to large concentrations of urban population . . . .

§ 459e(a). To effectuate this commendable goal, however, Congress provided the Secretary of the Interior with but a single weapon—condemnation.[5] That power, moreover, was further limited in application to unimproved, privately-

---

4. Judge Dooling's memorandum opinion, dated February 6, 1973, denying motions to dismiss the complaint by the federal and Brookhaven appellees, is unreported.

5. The municipal appellees vigorously argue that Congress could do no more, constitutionally, than authorize condemnation of

non-federally owned land on Fire Island; that it has no jurisdictional basis for exercising regulatory police powers over the area. We need not decide whether Congress has the power to do more, for it clearly chose only the condemnation route to protect the Fire Island landscape.

owned [6] property, with the exception [7] that the Secretary was empowered to condemn "improved property," [8] zoned in a manner not "satisfactory to the Secretary," [9] or which had been "subject to any variance, exception, or use that fails to conform to any applicable standard contained in regulations of the Secretary issued pursuant to this section and in effect at the time of passage of such ordinance . . . ." [10]

Thus, Congress carefully avoided interfering with the power of the municipalities on the Seashore to enact zoning ordinances or grant zoning variances. Federal oversight was restricted to condemnation upon the Secretary's post-implementation disapproval of a "duly adopted, valid, zoning ordinance," [11] or variance.[12] The Act, furthermore, requires the Secretary to issue regulations "specifying standards that are consistent with the purposes of sections 459e to 459e-9 of this title for zoning ordinances which must meet his approval," [13] and, quite reasonably, prohibits him from approving any

> ordinance or amendment thereof . . . which (1) contains any provisions that he considers adverse to the protection and development, in accordance with the purposes of sections 459e to 459e-9 of this title, of the area comprising the national seashore; or (2) fails to have the effect of providing that the Secretary shall receive notice of any variance granted under, or any exception made to, the

application of such ordinance or amendment.[14]

The Act, finally, authorizes an appropriation of "not more than $16,000,000 for the acquisition of lands" [15] consistent with the statute's limitations, and establishes a fifteen-member Fire Island National Seashore Advisory Commission to advise the Secretary on the development of the Seashore and on his exercise of condemnation power.[16]

Soon after the Act's passage, according to an affidavit by James Godbolt, presently Superintendent of Fire Island National Seashore and formerly Chief, Operations Evaluation, for the Northeast Region of the National Park Service [NPS], a Master Plan for the Seashore was developed by NPS. This plan, however, was considered deficient in certain respects and was not approved by the Director of NPS. Indeed, Godbolt's affidavit further relates that work on the Master Plan did not begin anew until June 1971 when funds for that purpose once again became available. By this time, moreover, Congress had enacted the National Environmental Policy Act [NEPA], which requires all federal agencies to prepare an EIS for any "major Federal action significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). Determining that a Master Plan constitutes a "major Federal action," [17] NPS also undertook preparation of an EIS in conjunction with the development of the Master Plan. Nei-

---

6. Section 459e-1(a) provides that "[a]ny property or interest therein [on the Seashore] owned by the State of New York, by Suffolk County, or by any other political subdivision of said State may be acquired only with the concurrence of such owner."

7. In addition to the exception discussed in the text, the Secretary is authorized to condemn improved property, without regard to applicable, local zoning ordinances, "in the approximately eight-mile area from the easterly boundary of the Brookhaven town park at Davis Park, in the town of Brookhaven, to the westerly

boundary of the Smith Point County Park." § 459e-1(e).

8. § 459e-1(f).

9. § 459e-1(e).

10. § 459e-2(e).

11. § 459e-1(e).

12. § 459e-2(e).

13. § 459e-2.

14. § 459e-2(d).

15. § 459e-9.

16. § 459e-8.

17. *See* 37 Fed.Reg. 4373 (1972).

ther document, however, has been completed to date, and at argument we were informed that completion is not expected before January, 1975.

Expenditures for acquisition of property pursuant to the Seashore Act have not been held in abeyance pending completion of the Master Plan and the EIS. In fact, the initial $16,000,000 appropriation has been virtually exhausted. Lawrence Hadley, Assistant Director, Park Management, of the NPS, reports by affidavit that, as of June 30, 1972, $15,723,439 had been spent for Seashore property, while the remaining $276,561 of appropriated funds is reserved against awards in excess of the Government's estimate in any of the eleven condemnation cases still pending in the district court. The NPS, according to the Government's brief on appeal, is awaiting completion of the Master Plan and EIS before asking Congress for a new appropriation.

On August 9, 1972, with almost eight years having elapsed since passage of the Seashore Act and no Master Plan or EIS in the offing, George Biderman, the first Chairman of the Seashore Advisory Commission, Charles Lowry, then Chairman of that Commission, and twelve other property owners on Fire Island, commenced this action in the Eastern District of New York against the Secretary of the Interior, various officials of the NPS, officials of the Towns of Islip and Brookhaven, and the Villages of Ocean Beach and Saltaire. The complaint sought relief, in the nature of mandamus, requiring the Secretary of the Interior to prepare an EIS "as soon as practicable," and declaratory relief, not here relevant, concerning motor vehicle traffic on the Seashore and the acquisition of ocean beaches. As to the municipal defendants, plaintiffs requested a prohibitory injunction, restraining those defendants from issuing any permits for building construction or swimming pools, granting zoning variances, or amending zoning ordinances,

> with regard to real property located within the Seashore until the Secre-

tary of the Interior prepares a proper and adequate environmental impact statement and any required changes, amendments or additions to the Regulations governing local zoning ordinances are promulgated and in effect.

· · ·

Further injunctive relief against the municipalities, not relevant to this appeal, was sought in connection with the operation and use of motor vehicles on the Seashore.

Before joining issue on the merits, the federal and Brookhaven defendants moved to dismiss the complaint primarily on the ground that, in alleging only federal *inaction*, the complaint failed to state a claim under NEPA. Judge Dooling, in an unreported opinion, denied the motions to dismiss, holding:

> Plaintiffs are entitled to present their case that federal inaction has proceeded to the point at which a court must be asked to determine whether or not the Secretary is liable to an order of mandamus requiring him forthwith to embark upon the performance of his duties imposed upon him by law, and whether plaintiffs are entitled to such incidental and preliminary relief as is necessary to preserve the subject matter of the action from further dissipation.

Moreover, with respect to the further contention of the Brookhaven defendants that they had not been charged with acting in an unlawful manner, the district judge commented only:

> It will be seen that the Town officials' points are presented very much in the same context as those of the federal defendants, and, for the same reason, in this most unusual case, it is concluded that their motion to dismiss must be denied.

On August 22, 1973, upon numerous affidavits and exhibits supporting the claim that the Seashore had already been irreparably harmed through overdevelopment, plaintiffs moved for a preliminary injunction restraining "defendants" from approving, issuing,

granting or authorizing, with respect to the Seashore: (a) permits for commercial or industrial construction, or swimming pools, (b) zoning variances, (c) zoning amendments, (d) permits for construction of any sort forward of a line 100 feet behind the dune line, (e) permits for construction on or dredging of the wetlands, (f) permits for other than essential motor vehicle use. Judge Dooling, in another unreported opinion, denied the motion for injunctive relief as to items (a) through (e) and held decision as to item (f), concerning motor vehicle use, "in abeyance." He concluded, in essence, that the court was powerless to enjoin the municipalities from implementing their zoning ordinances or any modifications thereto because the municipal action in no sense contravened federal law. Thus, Judge Dooling stated:

> The difficulty, if it be one, is plainly that no governmental action or controlling law has arrested the course of a lawful and continuing evolution of land use.

We are constrained to agree.

## II.

Although plaintiffs phrased their request for injunctive relief to apply to all "defendants" without distinction, it is clear that such relief is sought primarily against the municipal defendants, the local officials, who, after all, effectively "approve, grant, issue or authorize" the various permits, variances and amendments which appellants oppose. Indeed, with congressional funding essentially exhausted, it would appear rather meaningless to enjoin the federal defendants

from exercising their limited, post-enactment approval authority for in no event could condemnation now result from that decision. Moreover, Godbolt, in his affidavit in support of the Government's opposition to preliminary injunctive relief, stated:

> [T]he Superintendent [of Fire Island National Seashore] on behalf of the NPS, will refrain from approving any building permit applications, zoning variance applications or amendments to zoning regulations, provided that if special circumstances warrant, on 30 days written notice to plaintiffs, the Superintendent may take such action.

Accordingly, to the extent that plaintiffs seek preliminary injunctive relief against federal defendants, we agree with the court below that such relief is not appropriate under the circumstances here.[18]

Turning to the relief sought against the municipal defendants, we find an insurmountable, threshold barrier in appellants' failure to identify a discernible basis for the exercise of federal injunctive power over these non-federal defendants. Appellants do not suggest that the Seashore Act, alone, provides a cause of action against the municipal defendants under the facts of this case. That Act, quite simply, does not prohibit any zoning action by the various local governments located on the Seashore. As we have noted, the Secretary of the Interior is authorized only to condemn property zoned in a manner of which he disapproves—an action which cannot possibly be interpreted as a retroactive declaration of municipal illegality. And, we might add, appellants do

---

18. It is undisputed that plaintiffs, in their motion for a preliminary injunction, did not repeat—and thus, of course, Judge Dooling did not consider—their request that the Secretary of the Interior be ordered to prepare an EIS "as soon as practicable." For the first time in their reply brief, however, appellants suggest the possibility that such relief may now be appropriate. They state:

> If Federal defendants are now saying that an impact statement is voluntary on their part, we would ask this Court to is-

sue a mandatory injunction requiring the Federal defendants to prepare a proper Environmental Impact Statement as soon as practicable . . . .

Reply Brief of Appellants at 7. Suffice to say in response that we do not understand the federal defendants to be saying that an EIS is "voluntary on their part." As we noted, the NPS has announced its determination that a Master Plan is a "major Federal action" *requiring* preparation of an EIS. *See* note 17 *supra*.

not contend that NEPA itself imposes a duty directly upon non-federal entities, such as the Seashore municipalities, to perform or cease to perform any particular activity. This route has already been foreclosed by a number of appellate decisions. *See e. g.* Proetta v. Dent, 484 F.2d 1146 (2d Cir. 1973); Bradford Township v. Illinois State Toll Highway Auth., 463 F.2d 537, 540 (7th Cir.), cert. denied, 409 U.S. 1047, 93 S.Ct. 518, 34 L.Ed.2d 499 (1972); Ely v. Velde, 451 F.2d 1130, 1139 (4th Cir. 1971).

■ To be sure, it is well settled that non-federal parties may be enjoined, pending completion of an EIS, where those non-federal entities have entered into a partnership or joint venture with the Federal Government, and are thus recipients of federal funding. *See e. g.* Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 295, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958); Proetta v. Dent, *supra*, 484 F.2d at 1148; Silva v. Romney, 473 F.2d 287, 289–290 (1st Cir. 1973); Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1329 (4th Cir.), cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept., 446 F.2d 1013, 1027 (5th Cir. 1971), cert. denied, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972). *But cf.* Ely v. Velde, *supra*, 451 F.2d at 1139. The rationale behind this extension of federal power appears to be grounded in notions of consent. Thus, the Fifth Circuit stated:

> No one forced the State to seek federal funding, to accept federal participation, or to commence construction of a federal aid highway. The State, by entering into this venture, voluntarily submitted itself to federal law. It entered with its eyes open, having more than adequate warning of the controversial nature of the project and of the applicable law. And while this marriage between the federal and state defendants seems to have been an unhappy one, it has produced an already huge

concrete offspring whose existence it is impossible for us to ignore.

Individual Members of San Antonio Conservation Society v. Texas Highway Dept., *supra*, 446 F.2d at 1028 (footnote omitted). In this case, however, there is no contention that the municipal defendants solicited federal aid in any way and, indeed, it is the very lack of cooperative effort between the federal and municipal defendants which has so rankled appellants.

■ Nor is this a case in which non-federal action cannot lawfully begin or continue without the prior approval of a federal agency. *See e. g.* Greene County Planning Board v. Federal Power Commission, 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed. 2d 90 (1972) (transmission lines could not be strung without Federal Power Commission license); West Virginia Highlands Conservancy v. Island Creek Coal Co., 441 F.2d 232 (4th Cir. 1971) (timber-cutting and mining activity in Monongahela National Forest could not proceed without NPS permission). In such instances, if NEPA is construed to mandate that the requisite agency decision be enlightened by and grounded on an EIS, it is beyond cavil that the court may then enjoin the non-federal actors pending completion of that impact statement. Indeed, were such non-federal entities to act without the necessary federal approval, they obviously would be acting unlawfully and subject to injunction. *Cf.* West Virginia Highlands Conservancy v. Island Creek Coal Co., *supra*; Citizens for Clean Air, Inc. v. Corps of Engineers, U. S. Army, 349 F.Supp. 696, 706 (S.D.N.Y.1972).

■ But, as we have attempted to make clear, the federal government does not have what we characterize as "go-ahead" power over the zoning decisions of the Seashore municipalities. The validity—the operative effect—of the local zoning ordinances, variances and amendments does not depend on the prior approval of the Secretary of the

Interior.[19] He is authorized merely to acquire by condemnation "improved property" not zoned in an approved manner. At the present time, moreover, even this circumscribed option is not available to the Secretary because, as we have indicated, the $16,000,000 appropriated by Congress has been spent or earmarked for committed expenditure.[20]

■ Accordingly, we need not reach the issue of the celerity with which the Secretary must prepare an EIS, for assuming *arguendo* he were required to complete one forthwith, the municipal defendants would still remain outside the ambit of federal injunctive relief. Absent funds for condemnation, the statutory scheme devised by Congress leaves the Secretary absolutely powerless to arrest the allegedly destructive development of Fire Island. We simply cannot, by granting injunctive relief, arm the Secretary with "go-ahead" power when Congress, in the Seashore Act, saw fit not to do so.

On the basis of the affidavits and interrogatories in the record before us, there is little doubt in our minds that environmentalists—and indeed courts—have been and will continue to be frustrated in their commendable efforts to safeguard the natural beauty of Fire Island. In their justifiable frustration, plaintiffs have sought relief from the courts, but it is clear that only Congress can provide the remedy. Denial of the preliminary injunctive relief sought by plaintiffs must, therefore, be affirmed and the case remanded for further proceedings not inconsistent with this opinion.[21] Nevertheless, precatory

---

19. Appellants urge that McLean Gardens Residents Association v. National Capital Planning Commission, 2 ELR 20659 (D.D. C.1972), in which the "local" D.C. Zoning Commission was preliminarily enjoined from granting a zoning variance pending completion of an EIS by the "federal" National Capital Planning Commission [NCPC], is precedent for enjoining the conduct of an entity not directly controlled by NEPA, although the federal agency so governed has something less than the "go-ahead" power discussed in the text. Regrettably, we find the reasoning in *McLean* somewhat obscure. In any event, the case is factually distinguishable from the one before us.

Although it is true that the "[D.C.] Zoning Commission [is not] bound to follow the recommendation of the NCPC," Citizens Ass'n of Georgetown, Inc. v. Zoning Com'n of D. C., 155 U.S.App.D.C. 233, 477 F.2d 402, 407 (1973), the *McLean* court did not seem to focus on the NCPC's less than "go-ahead" role. Indeed, the court's finding of fact #24 suggests a contrary view:

The D.C. Zoning Regulations call for the review and *approval* of the National Capital Planning Commission *before* the D.C. Zoning Commission disposes of a preliminary application for a planned unit development. (emphasis added)

McLean Gardens Residents Association v. National Capital Planning Commission, *supra*, 2 ELR at 20661. In addition to this possible confusion over the power of the NCPC, which at the very least beclouds the premise upon which the court based its conclusion, it is important to note that the

NCPC's role in the D.C. zoning process is *preliminary* to action by the "local" Zoning Commission and not, as here, subsequent to the implementation of local zoning ordinances. Accordingly, an argument might be made that since Congress intended the "local" Zoning Commission to be informed by the NCPC *before* it enacted a zoning ordinance or variance, Congress also intended the Zoning Commission to await preparation of the EIS required of the NCPC *before* making that zoning decision. Yet, even this minimal degree of federal agency influence is not reflected in the *post*-implementation, federal review procedure embodied in the Seashore Act.

20. Were funds still avaialble for condemnation, the Secretary would at least have some control over land use on the Seashore, although we note parenthetically that appellants never sought to restrain the Secretary or his delegates from spending these funds pending completion of an EIS. Whether such federal power, in light of the apparent effort by Congress to preserve "home rule," would suffice to justify injunctive relief against these municipalities predicated on a theory of ancillary jurisdiction, is to be sure a thorny question, but one we need not resolve here.

21. Although we find no ascertainable basis for subject matter jurisdiction over the municipal defendants with respect to the injunctive relief denied below, we note that plaintiffs have requested injunctive relief, in addition, to restrain the issuance by the municipalities of motor vehicle permits for non-

though our words must necessarily be, we cannot help but urge those with the power and authority to preserve this gem of an island to halt their procrastination and get on with the urgent business of saving this charming and fragile outpost of nature before the encroachments of haphazard development irrevocably despoil it.

essential vehicle use on the Seashore. As we have indicated, decision as to this portion of the preliminary injunctive relief sought by plaintiffs was held in abeyance by the dis-

trict court, and thus, was not a part of this appeal. Accordingly, we express no view on whether jurisdiction over the municipal defendants might lie for this purpose.