**SAVE OUR SOUND FISHERIES ASSOCIATION**

v.

**Howard H. CALLAWAY, Secretary of the Army, et al.**

**Civ. A. No. 5297.**

United States District Court,
D. Rhode Island.

March 5, 1974.

Ernest C. Torres, John R. Allen, Hinckley, Allen, Salisbury & Parsons, Providence, R. I., for plaintiff.

Everett Sammartino, Asst. U. S. Atty. R. I., John F. Dolan, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

Plaintiff is a non-business corporation whose membership is comprised of corporations engaged in harvesting and processing fish, shellfish and lobsters found in Rhode Island Sound and adjacent coastal waters and sold primarily for human consumption. Plaintiff sues to enjoin defendants, the Secretary of the Army and the Chief of the Corps of Engineers of the United States Army, as well as a private corporation retained under Government contract, from dumping certain dredged spoil at an ocean dumping site located off the coast of Newport, Rhode Island, approximately 4.6 miles southeast of Brenton Reef Light (hereinafter referred to as the "Brenton Reef site"). Plaintiff alleges that the proposed dumping of dredged spoil will materially damage the marine environment and the fisheries resources from which the plaintiff's members derive a significant portion of their livelihoods and that it will violate several allegedly applicable statutes.

The proposed dredging, from which approximately 100,000 cubic yards of spoil will be generated, is the removal of three shoals from the Providence River, the final episode in the so-called Providence River and Harbor Project, the history of which can be traced briefly.

On October 27, 1965, Congress authorized the Corps of Engineers to dredge the Providence River from 35 to 40 feet below mean water along its entire length. Between September, 1967 and June, 1971 approximately 9.8 million yards of material have been dredged from the channel. The particular dumping in question in this suit, however, involves the proposed final phase of this dredging and dumping operation, which was the subject of a separate request for a Congressional appropriation and

a separate bidding and contracting procedure which resulted in the contract award to Great Lakes. The decision to dump at the Brenton Reef site was made sometime before the Corps' request for a supplementary Congressional appropriation in March, 1973. Sometime in May, 1973, the New England Division of the Corps (the "Corps") completed the specifications for the work in question. On May 21, 1973, advance notice of the proposed work was sent to prospective bidders and on June 1, 1973, the contract was advertised for bid. The contract was awarded to Great Lakes on June 29, 1973 and "notice to proceed" was issued on July 24, 1973.

Prior to the contract award, the Corps prepared a draft "environmental impact statement" (EIS), see National Environmental Policy Act of 1969 (NEPA, 42 U.S.C. § 4321 et seq.), which was circulated to various groups and governmental agencies for comment on May 2, 1973. On May 25, 1973, the draft EIS was submitted to the Council on Environmental Quality (CEQ). Between May 14, 1973 and July 16, 1973, comments on the proposed project were received from some of the organizations and governmental agencies to which the draft EIS had been circulated. A final EIS was filed with the CEQ on October 17, 1973.

As early as January 26, 1972, the Corps received notice from John R. Allen, Esq. as attorney for certain of plaintiff's members, that public hearings be held in connection with all proposed dredging projects that might result in dumping at the Brenton Reef site.[1] Although a public hearing was

---

1.

January 26, 1972

Mr. F. W. Fogarty, Chief
Operations Division
New England Division
Corps of Engineers
424 Trapelo Road
Waltham, Massachusetts   02157
Dear Mr. Fogarty:

The undersigned together with representatives of Manchester Seafoods, Inc., Point Trap Company, Inc., the Rhode Island Fishermen's Association, Tallman & Mack Fishing Company and H. M. Wilcox Company along with a number of other individuals engaged in the fishing industry had an opportunity on January 21, 1972 to attend a meeting presided over by Colonel Mason with respect to the problems of dumping in the ocean of materials to be dredged from the Thames River under a proposed project by the Navy. At the meeting considerable objection was expressed to the continued use of the dumping area 4.6 miles southeast of Brenton Reef Light.

Colonel Mason advised that the meeting was an informal exchange of views of interested agencies and that it was not a public hearing of the sort which is conducted by the Corps of Engineers in connection with its projects.

We have previously on behalf of Point Trap Company, Inc. and Manchester Seafoods, Inc. expressed our desire for a public hearing in connection with the proposed application for dredging by Texaco. We want now to be on record as requesting public hearings from your agency in connection with all dredging projects, whether commercial, state or federal, as to which any spoil would be dumped in the present dumping ground off Brenton Reef Light or in the neighboring waters. We respectfully request that consideration be given to the requests of my clients and other local people that any such hearing be held in Newport, Rhode Island where it would be possible for all who are vitally affected to be present.

While we appreciate your agency's permitting us to attend the January 21 meeting, the time and place required some sacrifice on the part of local fishermen.

Very truly yours,
John R. Allen

JRA:emt

held on April 26, 1960, no hearings on this final and separate phase of the Project have been held by the Corps.[2] In addition, no permit for dumping at the proposed site has been applied for or issued. Dep. of John Leslie at 72, 93–94. See Marine Protection, Research and Sanctuaries Act of 1972, 33 U.S.C. § 1413; Federal Water Pollution Control Act of 1972, 33 U.S.C. §§ 1311(a), 1344.[3]

A formal "notice of violation" was sent to the defendants by plaintiff on August 1, 1973, and on August 7, 1973 this suit was commenced. Plaintiff's allegations include the following:

(1) That defendants failed to apply for permits to dump the dredged spoil at the proposed site, and that plaintiff has received no notice or opportunity for public hearings regarding the proposed dumping. Plaintiff alleges that this failure is in violation of federal and state laws, in particular the Federal Water Pollution Control Act of 1972, (FWPCA) 33 U.S.C. §§ 1311(a), 1342(a), 1343 and 1344; the Marine Protection, Research, and Sanctuaries Act of 1972, (MPRSA) 33 U.S.C. § 1413 and Rhode Island General Laws §§ 46–17.1–1 and 46.17.1–2.

(2) That defendants failed to prepare a timely "environmental impact statement" (EIS), as required by the National Environmental Policy Act of 1969, (NEPA) 42 U.S.C. § 4332(2)(c) and the "Guidelines" issued by the Council on Environmental Quality ("CEQ"), 36 Fed.Reg. 7724 et seq. (1971); 38 Fed.Reg. 20550 et seq. (1973).

(3) That defendants failed to notify and consult with appropriate Federal and State officials and other interested parties regarding the intention to issue a permit for and/or the anticipated effects of such dumping as required by the MPRSA, 33 U.S.C. § 1413(a); The Fish and Wildlife Coordinating Act of 1934, 16 U.S.C. § 661 et seq., NEPA, 42 U.S.C. § 4321 et seq. and regulations promulgated pursuant thereto.

(4) That defendants have failed to obtain certification from the State of Rhode Island that the proposed dumping will comply with the provisions of the FWPCA, as required by 33 U.S.C. § 1341 and regulations thereto.

(5) That the dredged spoil contains polluted and toxic materials the dumping of which will violate applicable effluent and water quality standards and ocean dumping criteria established by the Environmental Protection Agency and the State of Rhode Island.

It is undisputed that the proposed dumpsite is located in "ocean waters" as that term is defined in the Marine

2. On February 23, 1973, a meeting was convened at the request of Dennis J. Murphy, Director of the Rhode Island Department of Natural Resources, for discussion of the proposed dumping at the Brenton Reef site. Although that informal meeting was attended by John Leslie of the New England Division of the Corps, no public notice of that meeting was given, no official record of the meeting was compiled, and it was not held under the auspices of the Corps. Dep. of John Leslie at 74–75, 88–93. Mr. Leslie admits that the only formal hearing conducted under the aegis of the Corps was that held in April, 1960.

3. Although it is clear that no statutory permit issuance procedures have been followed by defendants, the Regional Director of the Enforcement Division of the Environmental Protection Agency (EPA) has stated in a letter dated October 26, 1973 to Colonel John H. Mason of the New England Division of the Corps that the EPA does not object to the issuance of a permit under the applicable statutes. Administrative Record, Vol. 6, Doc. No. 63.

The Director of the Rhode Island Department of Natural Resources has also given its approval to the Brenton Reef dumpsite, but only for the limited purpose of completion of the Providence River dredging. Letter from Dennis J. Murphy to Colonel John H. Mason, October 10, 1973, Administrative Record, Doc. No. 59.

Protection, Research and Sanctuaries Act, and in "navigable waters" as that term is defined in the Federal Water Pollution Control Act.

A temporary restraining order was initially entered on August 9, 1973, and remained in effect by agreement of the parties. After defendants removed their consent from the continuation of the initial restraining order, a subsequent TRO was issued on February 1, 1974 and extended for good cause shown on February 11, 1974, in light of the pendency of motions which could be dispositive of the case. By agreement of the parties, that TRO has been extended to March 1, 1974.

The case is now before the Court on defendants' Motion for Judgment on the Pleadings and plaintiff's Motion for Summary Judgment.

## JURISDICTION

Jurisdiction is alleged under the "citizen suit" provision of the Marine Protection, Research, and Sanctuaries Act of 1972, 33 U.S.C. § 1415(g), the "citizen suit" provision of the Federal Water Pollution and Control Act of 1972, 33 U.S.C. § 1365, the Administrative Procedure Act, 5 U.S.C. § 701 et seq., and under 28 U.S.C. §§ 1331, 1332 and 1346.[4] Defendants move for judgment on the pleadings, alleging that this Court lacks subject matter jurisdiction over this action and, furthermore, that they are immune from such a suit under the doctrine of sovereign immunity.

The major thrust of plaintiff's complaint is that the defendants failed to comply with the procedural requirements of various federal laws relating to environmental protection, in that they allegedly failed to obtain permits, give public notice and opportunity for hearing and make public disclosure of anticipated environmental impact prior to commencing a federal project in which dredged spoil would be dumped in the ocean waters off Brenton Reef.

I find clear authority for this Court taking jurisdiction over such a claim of alleged failure of an agency to comply with procedural mandates of federal law relating to environmental matters. See Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); National Helium Corporation v. Morton, 455 F.2d 650 (10th Cir. 1971); The Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S. App.D.C. 380, 463 F.2d 783 (1971); Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2d Cir.), cert. denied, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970); Sierra Club v. Froehlke, 359 F.Supp. 1289, 1335 (S.D. Tex.1973); Sierra Club v. Mason, 351 F.Supp. 419 (D.Conn.1972); Citizens for Clean Air, Inc. v. Corps of Engineers, 349 F.Supp. 696 (S.D.N.Y.1972); Environmental Defense Fund v. Hardin, 325 F.Supp. 1401 (D.D.C.1971); Environmental Defense Fund v. Corps of Engineers, 324 F.Supp. 878 (D.D.C.1971); Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 728 (E.D. Ark.1971).

Although the above cited cases generally deal with the alleged failure of a federal agency to comply (or comply adequately) with the procedural requirements of NEPA, I find them equally as controlling on the question of jurisdiction over alleged failure to comply with the procedural mandates of other environmental legislation as well, such as FWPCA and MPRSA. The bulk of those cases hold that jurisdiction is properly in the federal court under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. See e. g., National Helium Corp. v. Morton, supra; Sierra Club v. Froehlke, supra; Sierra Club v. Mason, supra; Citizens for Clean Air, Inc. v. Corps of Engineers, supra, whereas others imply that federal courts have the power, under the environmental legislation itself, to review cases alleging a failure to com-

---

4. In plaintiff's memorandum in opposition to defendants' motion for judgment on the pleadings, it is conceded that 28 U.S.C. sec. 1346 has no application to the instant case.

ply with the procedural steps[1] required therein. *See* Calvert Cliffs Coordinating Committee v. U. S. Atomic Energy Commission, *supra,* 449 F.2d at 1115; Environmental Defense Fund v. Hardin, *supra.* Defendants have pointed to no "clear and convincing evidence" that the legislative intent behind that FWPCA, the MPRSA, or NEPA precludes judicial review of an agency's procedural conformity with those statutes, pursuant to the APA, 5 U.S.C. § 702. *See* Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Rusk v. Cort, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962); Citizens Committee for the Hudson Valley v. Volpe, 302 F.Supp. 1083, 1091 (S.D.N.Y.1969), aff'd 425 F.2d 97 (2d Cir.), cert. denied, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970).

■ Furthermore, it is clear that the doctrine of sovereign immunity does not bar an action against federal officers for allegedly acting in violation of federal statutes. As was noted in National Helium Corp. v. Morton, *supra:*

> "The fact that the Secretary was compelled by law to act in accordance with the NEPA and failed to do so brings this case within the exception noted in Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) . . . .. As we heretofore have noted, the Administrative Procedure Act authorizes review of agency action in cases such as this one."

*Id.* 455 F.2d at 654–655.[5]

*See* Sierra Club v. Froehlke, *supra;* Environmental Defense Fund v. Corps of Engineers, 324 F.Supp. 878, 880 (D. D.C.1971).

■ In addition to jurisdiction under the APA, jurisdiction is also properly premised on 28 U.S.C. § 1331. Sierra Club v. Froehlke, *supra;* Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731 (D.Conn.1972); Sierra Club v. Mason, *supra;* Citizens for Clean Air, Inc. v. Corps of Engineers, *supra;* Scherr v. Volpe, 336 F.Supp. 882 (W.D.Wis.1971), aff'd 466 F.2d 1027 (7th Cir. 1972). No showing has been made by defendants to refute plaintiff's good faith claim that pollution of the fishing waters in question would result in damages to the members of the plaintiff organization in excess of $10,000, and thus the sum claimed by the plaintiff controls. St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288, 58 S.Ct. 586, 82 L.Ed. 845 (1938); Citizens for Clean Air, Inc. v. Corps of Engineers, *supra* 349 F.Supp. at 703–704.

■ Jurisdiction having been properly premised on the APA, 5 U.S.C. § 702, and on 28 U.S.C. § 1331(a), this Court need not reach the question of the applicability of the "citizen suit" provisions of both the FWPCA, 33 U.S.C. § 1365, and the MPRSA, 33 U.S.C. § 1415(g), yet I feel compelled to make some comments on this question in light of the parties' extensive briefing on this issue. Defendants urge upon this Court the interpretation that these "citizen suit" provisions are specific grants of jurisdiction to insure that all persons (including an agency of the United States) comply with the *substantive* standards embodied in those

5. In a footnote in the *National Helium* case, the Court noted:
> "The Supreme Court, in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U. S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) recently has made it very clear that where there is no statutory prohibition of judicial review, and there is 'law to apply' (here the NEPA) thus removing the situation from the APA exception for action committed to agency discretion by law (denoted 'a very narrow exception' in *Overton Park*), *all* agency action is presumed to be reviewable." Id., 455 F.2d at 655 n. 12.

laws,[6] and that no provision is made for a "citizen suit" to enforce agency compliance with the procedural requirements of the laws (e. g. failure to obtain permit after notice, opportunity for public hearings, etc.). Even assuming *arguendo* that this position is tenable, but see note 6 *supra*, it cannot be argued, as defendants do, that a federal court is powerless to entertain a suit to enforce agency compliance with those statutory procedures which are alleged to be mandatory on the agency.[7] The statutory procedures for obtaining a permit (including notice and opportunity for public hearing) before potentially harmful substances are introduced into the water are designed to insure that such decisions are based on specific and informed findings regarding the effect of

---

**6.** Section 505(a) of the FWPCA, 33 U.S.C. sec. 1365(a), provides:

"(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf— .

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) *who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,* or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title." emphasis added. But see 33 U.S.C. § 1365(f), which provides, in pertinent part:

"For purposes of this section, the term 'effluent standard or limitation under this chapter' means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title . . . .."

It appears that dumping dredged spoil into navigable waters without compliance with the permit issuance procedures of § 1344 is an "unlawful act" under § 1311(a) and thus a violation of an "effluent standard or limitation" as that term is defined in the FWPCA.

Section 105(g)(1) of the MPRSA, 33 U.S.C. § 1415(g)(1), provides:

"(g)(1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), *who is alleged to be in violation of any prohibition, limitation, criterion, or permit established or issued by or under this subchapter.* The district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such prohibition, limitation, criterion, or permit, as the case may be." (emphasis added)

**7.** The Court is aware of the general rule that if Congress has provided adequate procedures for judicial review within a statutory scheme, the prescribed procedures are exclusive. *See* 5 U.S.C. § 703; Frito-Lay, Inc. v. Federal Trade Commission, 380 F.2d 8 (5th Cir. 1967); United States v. Southern Railway Co., 364 F.2d 86 (5th Cir. 1966), cert. denied, 386 U.S. 1031, 87 S.Ct. 1479, 18 L.Ed.2d 592 (1967). But, as the defendants themselves urge in their brief, the "citizen suit" provision of both the FWPCA and the MPRSA may be interpreted as dealing exclusively with suits challenging the violation of the substantive standards of those Acts, and not to suits to enforce compliance with the statutorily defined procedures for permit issuance. Under such a restrictive view of the "citizen suit" provisions as defendants urge, they certainly cannot be considered an adequate vehicle for judicial review of procedural compliance with the Acts.

In addition, the "citizen suit" provisions of both the MPRSA and the FWPCA contain clauses indicating that Congress did not intend for the citizen suit to be the exclusive means of judicial enforcement. *See, e. g.* 33 U.S.C. § 1415(g)(5) [MPRSA]:

"The injunctive relief provided by this subsection shall not restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or limitation or to seek any other relief (including relief against the Administrator, the Secretary, or a State agency)."

*See also* 33 U.S.C. § 1365(e) [FWPCA].

such dumping on the marine environment.[8] Compliance with such procedures when required is simply too important to justify a restrictive view of judicial power in this realm, and thus the court finds jurisdiction under the APA and 28 U.S.C. § 1331, even absent jurisdiction under the "citizen suit" provisions of the FWPCA and the MPRSA.[9]

## A. Applicability of Permit Issuance Procedures of MPRSA to Defendants

Defendants contend that the permit issuance procedures of the MPRSA, 33 U.S.C. § 1413,[10] do not apply to the

---

8. *See*, e. g. 33 U.S.C. § 1401:

"(a) Unregulated dumping of material into ocean waters endangers human health, welfare, and amenities, and the marine environment, ecological systems, and economic potentialities.

(b) The Congress declares that it is the policy of the United States to regulate the dumping of all types of materials into ocean waters and to prevent or strictly limit the dumping into ocean waters of any material which would adversely affect human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities."

Permits for ocean dumping of dredged material may only be issued, after notice and opportunity for public hearings, "where the Secretary determines that the dumping will not unreasonably degrade or endanger human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities," 33 U.S.C. § 1413(a), and must apply the Ocean Dumping Criteria established pursuant to 33 U.S.C. § 1412(a), relating to the effects of dumping. *See also* note 15 *infra*.

9. Again, assuming arguendo that the "citizen suit" provisions grant jurisdiction only to review compliance with the substantive criteria of the FWPCA and the MPRSA, but see note 6, *supra*, the Court need not consider whether it properly has jurisdiction under those provisions at this stage of the litigation. The record before the Court, compiled for the resolution of defendants' motion for judgment on the pleadings and plaintiff's motion for summary judgment, does not contain the necessary information to make any findings as to defendants' compliance with the relevant substantive criteria. Thus, the alleged failure of the plaintiff to give 60 days notice prior to bringing suit under the "citizen suit" provisions of the FWPCA, 33 U.S.C. § 1365, and the MPRSA, 33 U.S.C. sec. 1415(g) need not be reached. In light of the injunctive relief which the Court deems proper, the permit issuance procedures must be followed by defendants, *see infra*, and thus the relevant substantive criteria promulgated pursuant to 33 U.S.C. sec. 1412(a) and 33 U.S.C. sec. 1343(c) would have to be applied by the issuing authorities

after notice and public hearing. *See* 33 U.S.C. sec. 1413(b), 33 U.S.C. secs. 1342–1344. It is more appropriate, therefore, to leave the evaluation of the proposed project in light of the substantive criteria to the proper permit issuing authorities, at least in the first instance. Cf. Eisman v. Pan American World Airlines, 336 F.Supp. 543 (E.D.Pa. 1971).

10. Sec. 1413. Dumping permit program for dredged material—Issuance by Secretary of the Army

(a) Subject to the provisions of subsections (b), (c), and (d) of this section, the Secretary may issue permits, after notice and opportunity for public hearings, for the transportation of dredged material for the purpose of dumping it into ocean waters, where the Secretary determines that the dumping will not unreasonably degrade or endanger human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities.

Independent determination of need for dumping, other methods of disposal and appropriate locations

(b) In making the determination required by subsection (a) of this section, the Secretary shall apply those criteria, established pursuant to section 1412(a) of this title, relating to the effects of the dumping. Based upon an evaluation of the potential effect of a permit denial on navigation, economic and industrial development, and foreign and domestic commerce of the United States, the Secretary shall make an independent determination as to the need for the dumping. The Secretary shall also make an independent determination as to other possible methods of disposal and as to appropriate locations for the dumping. In considering appropriate locations, he shall, to the extent feasible, utilize the recommended sites designated by the Administrator pursuant to section 1412(c) of this title.

Disagreement of Administrator with determination of Secretary of the Army

(c) Prior to issuing any permit under this section, the Secretary shall first notify the Administrator of his intention to do so. In any case in which the Administrator disagrees with the determination of the Secretary as to compliance with the criteria es-

Corps of Engineers and that, even assuming their applicability, they have substantially complied with the requirements in relation to this project, even though no MPRSA permit was in fact issued for the project.

■ Defendants argue that the proposed dumping is part of the continuing Providence River and Harbor Project, authorized by Congress in 1965, prior to the effective date of the MPRSA and that, pursuant to 33 U.S.C. § 1416(b), no permit is required. The MPRSA, Section 106, 33 U.S.C. § 1416(a) and (b) provides:

"(a) After the effective date of this subchapter, all licenses, permits, and authorizations other than those issued pursuant to this subchapter shall be void and of no legal effect, to the extent that they purport to authorize any activity regulated by this subchapter, and whether issued before or after the effective date of this subchapter.

(b) The provisions of subsection (a) of this section shall not apply to actions taken before the effective date of this subchapter under the authority of the Rivers and Harbors Act of 1899."

Defendants view § 1416(b) as an explicit exception from the requirement of obtaining a dumping permit under 33 U.S.C. § 1413, citing the House report relevant to Section 106(b):

"This subsection preserves from the effect of subsection (a) those activities undertaken and permits issued under the authority of the Rivers and Harbors Act of 1899 which are taken before the effective date of this title. Actions taken subsequent to the effective date of this title will be covered by its provisions, including sections 103, 104 and subsection (a) of this section, as well as other provisions of this title." H.R.Rep.No.92–361, 92d Cong., 1st Sess. at 23 (1971).

I disagree with defendants' interpretation, and find the proposed dumping to be action taken subsequent to the effective date of the MPRSA. The MPRSA became effective 6 months after its enactment, to wit April 23, 1973. Even though Congressional approval for the entire dredging project was obtained in 1965, the funding for this final stage was separately appropriated. Although the major part of the overall project was completed between September, 1967 and June 1971,[11] the final work, that which is in question in this suit, was

tablished pursuant to section 1412(a) of this title relating to the effects of the dumping or with the restrictions established pursuant to section 1412(c) of this title relating to critical areas, the determination of the Administrator shall prevail. Unless the Administrator grants a waiver pursuant to subsection (d) of this section, the Secretary shall not issue a permit which does not comply with such criteria and with such restrictions.
Waiver of requirements
(d) If, in any case, the Secretary finds that, in the disposition of dredged material, there is no economically feasible method or site available other than a dumping site the utilization of which would result in noncompliance with the criteria established pursuant to section 1412(a) of this title relating to the effects of dumping or with the restrictions established pursuant to section 1412(c) of this title relating to critical areas, he shall so certify and request a waiver from the Administrator of the specific requirements involved. Within thirty days of the receipt of the waiver request, unless the Administrator finds that the dumping of the

material will result in an unacceptably adverse impact on municipal water supplies, shell-fish beds, wildlife, fisheries (including spawning and breeding areas), or recreational areas, he shall grant the waiver.
Federal projects involving dredged material
(e) In connection with Federal projects involving dredged material, the Secretary may, in lieu of the permit procedure, issue regulations which will require the application to such projects of the same criteria, other factors to be evaluated, the same procedures, and the same requirements which apply to the issuance of permits under subsections (a), (b), (c), and (d) of this section.

11. Defendants show that between September, 1967 and June, 1971 over 90 percent of the project was completed, involving the dredging of 9.8 million cubic yards of material, of which some 7 million cubic yards of material was dumped at the Brenton Reef site. The proposed work will require the removal and dumping of approximately 100,000 cubic yards of dredged spoil.

put out for bid under a new contract. The record reveals that the invitation for bids and the "Specifications for Removal of Unclassified Material in 40-Foot Channel, Providence River and Harbor, Rhode Island" were issued on June 1, 1973, more than one month after the MPRSA went into effect. Administrative Record, Doc.No.43. The closing date for the bids was June 26, 1973, and the contract was awarded to defendant Great Lakes on June 29, 1973. Notice to proceed was dated July 24, 1973, Administrative Record, Document No. 46. Certainly, within the meaning of 33 U.S.C. § 1416(a), the proposed action (i. e. dumping of dredged spoil) was to take place *after* the effective date of the MPRSA, and the bidding and contracting all took place *after* April 23, 1972, and thus any authorization for the project, even if issued *before* the effective date is void under § 1416(a). Section 1416(b) only exempts from the permit issuance procedures those *actions* (e. g. dumping) taken under authority of the Rivers and Harbors Act of 1899 between the date of the enactment of the MPRSA and its effective date, a period of six months. In light of the policy objectives behind the MPRSA, *see* note 8, *supra,* this is the only logical interpretation of § 1416(b), and is the interpretation accepted by the Regional Administrator of the Environmental Protection Agency. *See* letter from John A. S. McGlennon to Colonel John H. Mason, dated October 1, 1973, Administrative Record, Document No. 58.

Analogously, it has been held that the NEPA required the filing of an Environmental Impact Statement by the Corps of Engineers for a dredging and dumping project, despite defendants' contention that the dredging was part of an on-going project begun before the effective date of NEPA. Judge Newman's holding is instructive:

"This proposed dredging project entirely post-dates the effective date of NEPA. All of the planning, preparation of specifications, and solicitation of bids occurred after January 1, 1970.

Though obviously related to the previously completed project of building the harbor, this dredging project has a life of its own. Since the project, in and of itself, has the potential for harm to the environment, it is precisely the type of project for which NEPA requires the preparation of an impact statement." Sierra Club v. Mason, 351 F.Supp. 419, 425 (D.Conn. 1972).

*See* Environmental Defense Fund v. Tennessee Valley Authority, 339 F.Supp. 806 (E.D.Tenn.), aff'd 468 F.2d 1164 (6th Cir. 1972). *See also* Amended CEQ Guidelines, Section 1500.13, note 21, *infra.*

The Final Conference Committee Report on the MPRSA also makes clear the fact that the Corps of Engineers is not exempt from the permit issuance requirements of the MPRSA:

"It is expected that until such time as economic and feasible alternative methods for disposal of dredge material are available, no unreasonable restrictions shall be imposed on dredging activities essential for the maintenance of interstate and foreign commerce, and that, *consistent with the intent of this act, the disposal activities of private dredges and the Corps of Engineers will be treated similarly.*" House Conference Rep. No. 92–1546, 92d Cong., 2d Sess., October 9, 1972, *quoted in* 1972 U.S. Code Cong. & Ad.News, at 4279 (emphasis added).

The mere fact that Congress cautioned against unreasonable restrictions on dredging activities, and added that "the conferees assume that existing sites for disposal of dredged material will continue to be used and available," *id.,* cannot be interpreted to mean that the projects of the Corps are exempt from obtaining dumping permits under the MPRSA. At most, such comments are factors to be considered, along with many others, on the question of whether or not a particular permit should be issued.

Finally, rather than exempting dredging projects of the Corps from obtaining permits, Section 103(e) of the MPRSA, 33 U.S.C. § 1413(e) makes clear that all federal dredging and dumping projects are subject to the identical criteria and procedures as are private permit applicants.

> "(e) In connection with Federal Projects involving dredged material, the Secretary may, in lieu of the permit procedure, issue regulations which will require the application to such projects of the same criteria, other factors to be evaluated, the same procedures, and the same requirements which apply to the issuance of permits under subsections (a), (b), (c), and (d) of this section."

Since the Court recognizes that the majority of "Federal projects involving dredged material" are projects conducted by the Corps of Engineers, the conclusion is inescapable that the Corps must either follow the permit issuance procedures under 33 U.S.C. § 1413 or, pursuant to § 1413(e), apply to such projects the same criteria and follow the same procedures (including notice and opportunity for public hearings) as would be applicable to a private permit applicant.

█ Despite defendants' contention that it has, in effect, complied with the conditions of the MPRSA, the record does not substantiate such a finding. The mere fact that the EPA has stated that it does not oppose the issuance of a permit to dump the material from the Providence River project at the proposed Brenton Reef site, *See* Administrative Record, Document No. 63, does not moot the question of compliance with the other procedures of the dumping permit program established under 33 U.S.C. § 1413. Most importantly, defendants' circumvention of the § 1413 procedures effectively eliminated the public disclosure and discussion procedures mandated by the MPRSA. Surely if Congress had intended that the approval of the EPA was the only condition to permit issuance, the public notice and hearing requirement would be superfluous. Clearly, Congress intended that a decision as to what materials would be dumped in the ocean and where such materials would be dumped, be based on a broad spectrum of opinion going beyond the mere approval by the EPA according to that agency's finding of compliance with the appropriate dumping criteria.[12]

█ Finally, I find wholly frivolous defendants' contention that hearings held in 1960, 13 years prior to the time that specifications for this phase of the project were prepared and 12 years prior to Congressional enactment of the MPRSA, serves to satisfy that Act's public hearing requirements. Nor was the meeting held on February 23, 1973 a sufficient public hearing. *See* note 2 *supra*. That meeting was not officially conducted under the aegis of the Corps.

---

12. The Corps of Engineers' own regulations mandate that the public notice required before a permit is issued contain the following statement:

> "The decision whether to issue a permit will be based on an evaluation of the probable impact of the proposed activity on the public interest. That decision will reflect the national concern for both protection and utilization of important resources. The benefit which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. All factors that may be relevant to the proposal will be considered: among those are conservation, economics, esthetic, general environmental concerns, historic values, fish and wildlife values, flood damage prevention, land use classification, navigation, recreation, water supply, water quality, and, in general, the needs and welfare of the people. No permit will be granted unless its issuance is found to be in the public interest."

Proposed Rules relative to Permits for Activities in Navigable Waters or Ocean Waters, § 209.120(j)(1)(ix)(a), 38 Fed.Reg. 12226–12227 (1973).

The above statement is in addition to notice that the evaluation of the impact of discharging the dredged material will include application of the EPA Guidelines under the MPRSA and the FWPCA. *See* Proposed Rules, § 209.120(j)(1)(ix)(a)(2), 38 Fed. Reg. 12227 (1973).

Dep. of John Leslie at 92–93. In addition, no notice of this meeting was prepared or distributed to the interested parties. The Corps' own regulations state:

"The public notice is the primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information necessary to evaluate the probable impact on the public interest. The notice must, therefore, include sufficient information to give a clear understanding of the nature of the activity to generate meaningful comments." Proposed Regulations, § 209.120(j)(1), 38 Fed. Reg. 12226 (1973).

Without public notice to all interested parties, and without public circulation of the details of the proposed activity before the hearing, meaningful and orderly public input into the permit procedure is lost. Since there is no indication in the record that sufficient public notice was given, the February 23, 1973 informal meeting cannot be considered compliance with the "opportunity for public hearing" requirements of the MPRSA.[13]

Certainly, circulation of a draft Environmental Impact Statement in May, 1973, as required under the NEPA, does not moot the necessity for compliance with the notice and opportunity for hearing requirements of the MPRSA, a separate and distinct Congressional mandate more specifically aimed at analysis of the effects of ocean dumping on the marine ecology.

It is the holding of this Court that the defendants are required to follow the permit issuance procedures (including notice and an opportunity for public hearings) mandated by 33 U.S.C. § 1413 and in so doing apply the ocean dumping criteria promulgated pursuant to 33 U.S.C. § 1412(a), as required by 33 U.S.C. § 1413(b).

B. Applicability of Permit Issuance Procedures of FWPCA to Defendants

Plaintiff alleges that there has been a violation of the FWPCA, 33 U.S.C. § 1251 et seq. because (a) there has not been application for or issuance of a permit in violation of 33 U.S.C. §§ 1311 and 1344,[14] and (b) defendants have

---

13. It being the determination of the Court that proper public notice was not properly circulated according to 33 U.S.C. § 1413(a) and regulations promulgated pursuant thereto, it is unnecessary for the Court to determine the sufficiency of plaintiff's request for hearing by letter dated January 26, 1972.

14. Section 301(a) of the FWPCA, 33 U.S.C. § 1311(a) provides:

"(a) Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."

Section 404 of the FWPCA, 33 U.S.C. § 1344 provides:

"§ 1344. Permits for dredged or fill material

(a) The Secretary of the Army, acting through the Chief of Engineers may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.

(b) Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary

of the Army (1) through the application of guidelines developed by the Administrator in conjunction with the Secretary of the Army, which guidelines shall be based upon criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under section 1343(c) of this title, and (2) in any case where such guidelines under clause (1) alone would prohibit the specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage.

(c) The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such

not obtained certification from the State of Rhode Island that the proposed dumping will comply with state water quality standards and related requirements.

Defendants contend that they are exempt from the permit issuance requirements of the FWPCA, citing Section 511(a) of the FWPCA, and 33 U.S.C. § 1371(a), and 40 C.F.R. § 125.4 in support of their position.

Section 511(a) of the Act, 33 U.S.C. § 1371(a) provides in pertinent part:

"This chapter shall not be construed as . . . (2) affecting or impairing the authority of the Secretary of the Army (A) to maintain navigation or (B) under the Act of March 3, 1899 . . . ."

■ While defendants construe the above provision as a broad exemption from the permit issuance requirements of the FWPCA for all Corps projects affecting navigation, I do not read that provision so broadly. In the first place, such a broad exemption runs contrary to the Congressional intent behind the FWPCA.[15] Secondly, the requirement of obtaining a permit under 33 U.S.C. § 1344 for the discharge of dredged material into navigable waters, after notice and opportunity for public hearings, cannot be said to "affect or impair" the authority of the Secretary of the Army to maintain navigation. Clearly the permit issuance procedures of the FWPCA do not prohibit dredging and dumping operations by the Corps of Engineers

for the purpose of improving navigation, but only that the environmental impact of the discharge of dredged materials in navigable waters be publicly analyzed before a particular disposal of dredged spoil is made. The Corps of Engineers retains its full authority, under other applicable statutes, to improve the navigable waters by dredging or otherwise.

Defendants' reliance on 40 C.F.R. § 125.4 (38 Fed.Reg. 13530 (1973) ) as creating an exception to the permit procedure for Corps projects is likewise misplaced. Those regulations were promulgated by the EPA pursuant to Sections 402 and 405 of the FWPCA, 33 U.S.C. §§ 1342 and 1345. The regulations pertain to those permits to be issued by the Administrator of the EPA under the National Pollutant Discharge Elimination System (NPDES). 40 C.F.R. § 125.4 (38 Fed.Reg. 13530) states, in pertinent part:

"The following do not require an NPDES permit . . . (d) Dredged or fill material discharged into navigable waters . . . ."

The regulation does not pertain, however, to permits to be issued under Section 404 of the FWPCA, 33 U.S.C. § 1344 ("Permits for dredged or fill material") since those permits are issued not by the Administrator of EPA but by the Secretary of the Army acting through the Chief of Engineers. Thus, 40 C.F.R. § 125.4(d) merely clarifies the fact that permits for discharging dredged or fill material into navigable waters are to

determination, the Administrator shall consult with the Secretary of the Army. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection."

15. 33 U.S.C. § 1251 provides in pertinent part:
"§ 1251. Congressional declaration of goals and policy
(a) The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter—

(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;
(2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983 . . . ."
*See also* Senate Report No. 92–414, 92d Cong., 2d Sess., 1972 (at 1972 U.S.Code Cong. & Ad.News, p. 3679):
"A high degree of informed public participation in the control process is essential to the accomplishment of the objectives we seek—a restored and protected natural environment."

be issued by the Secretary of the Army under § 1344 rather than by the Administrator of the EPA under §§ 1342 or 1345. Defendants' interpretation of the regulation would serve to nullify 33 U.S.C. § 1344 by administrative regulation which clearly would be impermissible.

The Congressional intent that the permit issuance procedures apply to Corps projects is also clear from Section 301(a) of the FWPCA, 33 U.S.C. § 1311 (a), which provides:

"(a) Except as in compliance with this Section and Sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."

"Pollutant" is defined in the applicable statutes and regulations to include "dredged spoil," *see* 33 U.S.C. § 1362(6); 40 C.F.R. § 125.1(X) (38 Fed.Reg. 13529 (1973)). Nowhere in the Act are agencies of the United States Government, including the Corps, explicitly excluded from the permit requirements. Although the Congressional Conference Committee expresses some concern over unreasonable restrictions on dredging activities essential for the maintenance of interstate and foreign commerce, the Committee clearly intended the Corps' activities to be subject to permit issuance procedures and criteria under the FWPCA.

"Consistent with the intent of this Act, the conferees expect that the disposal activities of private dredgers and the Corps of Engineers will be treated similarly." Conference Report No. 92–1236, 92d Cong., 2d Sess. (1972), 1972 U.S.Code Cong. & Ad. News at 3819.

Defendants also put forward the theory that Section 404 of the Act, 33 U.S.C. § 1344, is only a grant of authority to issue permits under the FWPCA, not a limitation of the Corps' authority. To accept defendants' characterization would be to accept the concept that as far as the disposition of dredged spoil from the Corps' own projects is concerned, the Corps has complete and unbridled discretion, immune from public scrutiny and from outside input into its decision. The Corps' operations are simply too vast,[16] and the legislative intent behind the FWPCA too compelling,[17] for me to accept such a statutory interpretation.

▪ Defendants are correct, however, that state certification is not necessary prior to the issuance of a permit. Although Section 401 of the FWPCA, 33 U.S.C. § 1341(a)(1), requires any applicant for a federal permit to obtain such certification, § 1341(a)(6) provides, "No Federal agency shall be deemed to be an applicant for the purposes of this subsection."[18] Defendant Great Lakes, as the dredging contractor for this federal project, is under no greater statutory duty than the Corps itself. Since the project is exempt from state certification, defendant Great Lakes is similarly exempt.

It is the holding of this Court that the defendants are required to follow the permit issuance procedures (including notice and an opportunity for public hearings) mandated by 33 U.S.C. § 1344 and regulations pursuant thereto, and in so doing apply the guidelines promulgat-

---

16. Plaintiff points to the fact that Corps dredging projects currently under consideration will potentially yield several million cubic yards of dredged spoil in Southeastern New England alone, indicating the vast implications posed by a broad exemption from permit requirements for Corps projects. *See* Dep. of John Leslie, at 156 et seq.

17. *See* note 15 *supra.*
If the Corps or its contractors could avoid the permit issuance procedures of 33 U.S.C.

§ 1344(a) and (b), presumably such projects would be immunized from EPA review of disposal site specification authorized by 33 U.S.C. § 1344(c).

18. The fact that federal agencies are explicitly exempted from state certification procedures under 33 U.S.C. § 1341(a)(6), lends additional weight to this Court's decision that all federal agencies remain subject to the other permit issuance procedures.

ed pursuant to 33 U.S.C. § 1343(c), as required by 33 U.S.C. § 1344(b).[19]

### C. Applicability of Permit Requirements of Rhode Island Law

Plaintiff alleges that defendants have acted in violation of R.I.Gen.Laws § 46–17.1–1 and § 46–17.1–2 in failing to obtain a permit for the dumping of dredged material in the territorial waters of the state. G.L. § 46–17.1–1 provides:

"46–17.1–1. Transporting of wastes and dredge materials over state waterways prohibited.—No person, either as principal, agent, or servant, shall, without a state permit, transport or cause to transport, dump, or cause to be dumped within the territorial waters of the state, any waste or dredge material dredged from any harbor or channel or removed from any dump or sewerage treatment plant; such materials will include any one or more of the following: mud, silt, shale, rock, muck, sand, garbage, or sewerage. Every person who shall violate any provisions of this section shall, upon conviction, be fined not more than one thousand dollars ($1,000) or be im-

prisoned not more than one (1) year, or both, for each such offense."

G.L. § 46–17.1–2 sets out the procedures and criteria for the issuance of such permits.

It is clear, however, that insofar as State law is applicable to an activity regulated by the MPRSA, State law may not be enforced. Section 106(d) of the MPRSA, 33 U.S.C. § 1416(d) provides:

"After the effective date of this subchapter, no State shall adopt or enforce any rule or regulation relating to any activity regulated by this subchapter."[20]

Since this Court holds that the MPRSA is applicable to the project in question, R.I.G.L. §§ 46–17.1–1 and 46–17.1–2 cannot be enforced against the instant defendants, since the R. I. law purports to regulate certain dumping of dredged spoil which is governed by the provisions of the MPRSA.

### D. Compliance with NEPA

Defendants do not argue that the project is exempt from the requirements of NEPA, 42 U.S.C. § 4321 et seq. including the preparation of an Environmental Impact Statement (EIS).[21] De-

---

19. The final regulations and criteria for the issuance of ocean dumping permits were promulgated on October 15, 1973, and serve as criteria both under Section 102(a) of the MPRSA, 33 U.S.C. § 1412(a), and under section 403(c) of the FWPCA, 33 U.S.C. § 1343(c). *See* 38 Fed.Reg. 28609 et seq. (1973). Thus, it may be feasible to telescope the permit issuance procedures of the FWPCA and the MPRSA as far as ocean dumping permits are concerned, so as to minimize duplication. To the extent this is possible without circumventing any of the required substantive determinations necessary under either Act, the Court would approve such a streamlined procedure.

20. 33 U.S.C. § 1416(d) does permit, however, a State to propose to the Administrator of the EPA criteria relating to ocean dumping that are not inconsistent with the purpose of the MPRSA, which criteria may be adopted and implemented within the federal permit program.

In addition, the State of Rhode Island retains a great deal of imput into the permit issuance decision under the applicable notice

and hearing provisions of the MPRSA and the FWPCA, and regulations promulgated pursuant thereto, as well as under the NEPA.

21. New CEQ Guidelines, Section 1500.13, provides as follows:
"§ 1500.13 Application of section 102(2) (C) procedure to existing projects and programs.

Agencies have an obligation to reassess ongoing projects and programs in order to avoid or minimize adverse environmental effects. The section 102(2)(C) procedure shall be applied to further major Federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of the Act on January 1, 1970. While the status of the work and degree of completion may be considered in determining whether to proceed with the project, it is essential that the environmental impacts of proceeding are reassessed pursuant to the Act's policies and procedures and, if the project or program is continued, that further incremental major ac-

fendants assert, however, that they have complied with the NEPA, in that a draft EIS was filed with the Council on Environmental Quality (CEQ) and circulated on May 25, 1973, and that a final EIS was filed with the CEQ on October 17, 1973.

Plaintiff does not now take issue with the *contents* of the EIS or its adequacy under the requirements of· Section 102(C), 42 U.S.C. § 4332(C). *See, e. g.* Natural Resources Defense Council v. Morton, 337 F.Supp. 167 (D.D.C.1971),

aff'd 148 U.S.App.D.C. 5, 458 F.2d 827 (1972). In light of defendants' having filed a final impact statement subsequent to the commencement of this action, plaintiff now alleges that defendants have failed to comply with applicable CEQ "Guidelines" regarding the timing of the EIS. *See* 36 Fed.Reg. 7724–29 (1971). *See also* Amended CEQ Guidelines, 38 Fed.Reg. 20556 (1973)`. In particular, plaintiff alleges non-compliance with Section 10(b) [22] of the CEQ Guidelines.

---

tions be shaped so as to enhance and restore environmental quality as well as to avoid or minimize adverse environmental consequences. It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program." 38 Fed.Reg. 20556 (1973).

22. Section 10(b) of the original CEQ Guidelines promulgated on April 23, 1971, provides in pertinent part:

"It is important that draft environmental statements be prepared and circulated for comment and furnished to the Council early enough in the agency review process before an action is taken in order to permit meaningful consideration of the environmental issues involved. To the maximum extent practicable no administrative action (i. e., any proposed action to be taken by the agency other than agency proposals for legislation to Congress or agency reports on legislation) subject to section 102(2)(C) is to be taken sooner than ninety (90) days after a draft environmental statement has been circulated for comment, furnished to the Council and, except where advance public disclosure will result in significantly increased costs of procurement to the Government, made available to the public pursuant to these guidelines; neither should such administrative action be taken sooner than thirty (30) days after the final text of an environmental statement (together with comments) has been made available to the Council and the public."

36 Fed.Reg. 7726 (1971).

Section 5(a) defines administrative "action" to include:

"(i) Recommendations or favorable reports relating to legislation including that for appropriations . . . .

(ii) Projects and continuing activities: directly undertaken by Federal agencies; supported in whole or in part through Federal contracts, grants, subsidiaries, loans, or other forms of funding assist-

ance; involving a Federal lease, permit, license, certificate, or other entitlement for use."

36 Fed.Reg. 7724 (1971).

The amended CEQ Guidelines, which are applicable to all draft and final impact statements filed after January 28, 1973, are to the same effect.

Section 1500.7 provides in pertinent part: "It is important that draft environmental statements be prepared and circulated for comment and furnished to the Council as early as possible in the agency review process in order to permit agency decisionmakers and outside reviewers to give meaningful consideration to the environmental issues involved. In particular, agencies should keep in mind that such statements are to serve as the means of assessing the environmental impact of proposed agency actions, rather than as a justification for decisions already made. This means that draft statements on administrative actions should be prepared and circulated for comment prior to the first significant point of decision in the agency review process."

38 Fed.Reg. 20552 (1973).

Section 1500.11(b) provides in pertinent part:

"(b) To the maximum extent practicable no administrative action subject to section 102(2)(C) is to be taken sooner than ninety (90) days after a draft environmental statement has been circulated for comment, furnished to the Council and, except where advance public disclosure will result in significantly increased costs of procurement to the Government, made available to the public pursuant to these guidelines; neither should such administrative action be taken sooner than thirty (30) days after the final text of an environmental statement (together with comments) has been made available to the Council commenting agencies, and the public."

38 Fed.Reg. 20556 (1973).

The Court is cognizant of the importance of filing and circulating an EIS at an early stage in the planning of a project having potential environmental impact. *See* Lathan v. Volpe, 455 F.2d 1111, 1121 (9th Cir. 1971). Clearly, an EIS was not filed at the time of the appropriation request for this project, which was subsequent to the effective date of the NEPA. *See* Environmental Defense Fund v. Tennessee Valley Authority, 339 F.Supp. 806, 811 (E.D. Tenn.), aff'd 468 F.2d 1164 (6th Cir. 1972). The CEQ Guidelines were also violated in that the contract for the project was awarded to defendant Great Lakes on June 29, 1973 nearly 2 months short of the ninety day evaluation period specified for a draft EIS (filed May 25, 1973). Moreover, at the time the contract was awarded, the final EIS had not been filed, and was not filed until 1½ months after this action was commenced.

■ This Court certainly has the power to enjoin proposed federal action until the delinquent agency complies with the procedural mandates of the Act, including a review of the sufficiency of the EIS. Calvert Cliffs' Coordinating Committee, Inc. v. U. S. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); National Helium Corp. v. Morton, 455 F.2d 650 (10th Cir. 1971); Sierra Club v. Froehlke, 359 F.Supp. 1289 (S.D.Tex. 1973); Natural Resources Defense Council, Inc. v. Grant, 355 F.Supp. 280 (E.D.N.C.1973); National Resources Defense Council, Inc. v. Morton, *supra*; Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 749 (E.D.Ark. 1971), aff'd 470 F.2d 289 (8th Cir.), inj. denied, 409 U.S. 1072, 93 S.Ct. 674, 675, 34 L.Ed.2d 661 (1972).

In addition, several courts have held that the federal courts have an obligation to review substantive agency decisions

"[to determine] whether the agency reached its decision after a full, good faith consideration of environmental

factors made under the standards set forth in §§ 101 and 102 of NEPA; and whether the actual balance of costs and benefits struck by the agency according to these standards was arbitrary or clearly gave insufficient weight to environmental factors." Environmental Defense Fund v. Froehlke, 473 F.2d 346, 353 (8th Cir. 1972).

*See* Conservation Council of North Carolina v. Froehlke, 473 F.2d 664 (4th Cir. 1973), rev'g 340 F.Supp. 222; Environmental Defense Fund v. Corps of Engineers, *supra*, 470 F.2d 289, 297–301 (8th Cir. 1972) (cases collected at 299 n. 15); Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, *supra*, 449 F.2d at 115; Scenic Hudson Preservation Conference v. Federal Power Commission, 453 F.2d 463, 468–469 (2d Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972). *But see* National Helium Corp. v. Morton, *supra*. As the Eighth Circuit made clear in Environmental Defense Fund v. Corps of Engineers, *supra*:

"In view of the foregoing matter, we conclude that a purely mechanical compliance with the procedures of § 102 is not sufficient to satisfy the provisions of NEPA." *Id.*, 470 F.2d at 298 n. 13.

■ Yet, despite defendants' tardiness in filing the EIS, plaintiff has not come forward at this stage of the litigation with any evidence that defendants' efforts, though delayed, were inadequate under section 102(2)(C). Nor is the record adequate to show that in reaching its decision to proceed with the project as originally planned, after the EIS was filed, that the defendants acted arbitrarily or capriciously, or that its compliance with the NEPA was merely an empty gesture.

The fact remains that a draft EIS was circulated for comment, and a final EIS filed with CEQ at a point in time when the decision as to *where* to dump the dredged spoil was not irreversible.

The location of the proposed dumping site is plaintiff's major concern. While the Court does not condone tardy compliance with the NEPA, it is a fact that the proposed dumping of dredged spoil from the project has not yet occurred, and the opportunity to comment under NEPA, as well as the permit issuance procedures which the Court today finds applicable to the instant defendants, should insure that every procedural safeguard fashioned by Congress to prevent environmental degradation will be followed.[23]

Since the NEPA impact statement requirements have been satisfied by defendants, and since the plaintiff at this point has not put forward sufficient evidence to challenge the adequacy of the EIS or the administrative determinations made under NEPA, reliance on NEPA as a distinct ground in support of injunctive relief is unfounded.[24] Other courts have found that once an agency complies satisfactorily with the requirements of the NEPA, an injunction entered against a proposed project should be vacated. *See* Environmental Defense Fund v. Corps of Engineers, 342 F.Supp. 1211, *supra*; Sierra Club v. Mason, 365 F.Supp. 47 (D.Conn.1973).

### Relief

Defendants' motion for judgment on the pleadings is hereby denied. Plaintiff's motion for summary judgment is granted insofar as the defendants Callaway and Gribble, as Secretary of the Army and Chief of the Corps of Engineers of the United States Army respectively, and defendant Great Lakes Dredge & Dock Company and all other persons acting in concert with them are hereby enjoined from engaging in any dumping or other disposal of materials in the waters at or near latitude 41° 23′ 25″ and longitude 71° 17′ 58″ or at any other location in which such dumping is regulated by the Marine Protection, Research and Sanctuaries Act of 1972, 33 U.S.C. § 1401 et seq. or the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1251 et seq., until such time as the permit issuance procedures mandated by those Acts, 33 U.S.C. § 1413 (MPRSA) and 33 U.S.C. § 1344 (FWPCA) are fully complied with, the determinations required thereunder are made, and valid permits issued for the projects in question. Nothing in this opinion is to be construed as limiting judicial review of any permit so issued, on application of a proper party, as to the compliance of the proposed dumping with any applicable standards or limitations, as provided by law.

Plaintiff will draft an order accordingly.

23. Following appropriate procedures at the administrative level designed to insure compliance with applicable substantive standards, plaintiff or any other proper party may of course seek substantive judicial review of the agency decision either under the citizen suit provisions of the MPRSA, 33 U.S.C. § 1415(g), the FWPCA, 33 U.S.C. § 1365 or under the NEPA itself. *See* Environmental Defense Fund v. Corps of Engineers, 470 F.2d 289, *supra;* Conservation Council of North Carolina v. Froehlke, 473 F.2d 664, *supra.*

24. With regard to plaintiff's claim of failure to comply with the Fish and Wildlife Coordination Act, 16 U.S.C. § 661 et seq., the Court agrees with the finding of the Eighth Circuit that good faith compliance with NEPA will " 'automatically take into consideration all of the factors required by the Fish and Wildlife Act and it is not reasonable to require them to do both separately.' " Environmental Defense Fund v. Froehlke, *supra*, 473 F.2d at 356, *quoting* Environmental Defense Fund v. Corps of Engineers, 325 F. Supp. 749, 754, *supra.*